USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 29, 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
           :
           :
           :

IN RE ALUMINUM WAREHOUSING   :     13-md-2481 (KBF)
ANTITRUST LITIGATION         :   and all related cases
           :
           :   <u>OPINION & ORDER</u>
           :

------------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

      Before the Court are 13 motions to dismiss the antitrust and state law claims brought by purchasers of aluminum and aluminum products. Plaintiffs allege that defendants, a commodities exchange, traders and warehouse owners have engaged in a horizontal conspiracy to restrain the output of aluminum. According to plaintiffs, defendants together arranged to stockpile aluminum in warehouses in the Midwestern portion of the United States and delayed load-outs of such aluminum, causing storage costs to increase. This led to an increase in the Midwest Premium, a price component that incorporates a number of inputs including storage costs. Plaintiffs allege that their purchases of aluminum are priced with reference to the Midwest Premium, and that they therefore paid inflated prices.[1]

      Plaintiffs are not themselves aluminum producers, traders or warehouse owners. Plaintiffs are not, in short, competitors of defendants in any market. Nor are they consumers of their products (warrants or trading instruments with regard

---

[1] In addition to these allegations, as discussed below, certain plaintiffs also allege that the warehouses raised prices for storage and took actions that impacted a regional premium in the Netherlands. These allegations are not particularly developed. Separately, plaintiffs also assert state law claims based on the conduct underlying the federal antitrust claims.

to the traders) or services (warehouse storage). They are purchasers at different levels of the supply/distribution chain of semi-fabricated and fabricated aluminum. The following plaintiffs have filed complaints: the First Level Purchasers ("FLPs") (ECF No. 271 ("FLP Compl.")); Commercial End Users (ECF No. 242 ("Comm. Compl.")); Consumer End Users (ECF No. 227 ("Cons. Compl.")); Mag Instrument, Inc. ("Mag") (ECF No. 226 ("Mag Compl."); Agfa Corp. & Agfa Graphics, N.V. ("Agfa") (ECF No. 272 ("Agfa Compl.")).[2]

The motions to dismiss as to each of the operative complaints raise a variety of common issues: antitrust standing, plausibility and sufficiency of allegations supporting claims alleging violations of sections 1 and 2 of the Sherman Act, failure adequately to allege a relevant antitrust market, and an absence of viable state law claims. In addition, individual motions argue a lack of personal jurisdiction (ECF Nos. 327-28, 447-48, 503-05, 511-13), or specific allegations tying specific defendants to the challenged conduct (ECF Nos. 309-10, 327-29, 331-32, 338-39, 447-48, 503-05, 511-13, 520-21). Plaintiffs have, in general, submitted joint briefs opposing the motions, though in certain instances they have filed separate briefs. (ECF Nos. 390, 393-95, 397, 399, 401-03, 481, 531, 534, 540, 542, 544, 550.) Together, the filings on these motions to dismiss consist of more than 2,600 pages of notices of motion, legal memoranda, declarations, and exhibits, as well as many

---

[2] There were originally over twenty complaints filed and transferred to or consolidated with others in this Court. A number of plaintiffs agreed to consolidate their actions. Thereafter, consolidated and/or amended complaints were filed. Recently, Eastman Kodak Co. ("Kodak") also filed a complaint. (Eastman Kodak Co. v. The Goldman Sachs Grp., Inc., No. 14-cv-6849 ECF No. 1.) However, defendants have not yet moved as to that complaint. Accordingly, this Opinion & Order does not address that complaint directly. However, where there are similarities, any future Court ruling on that complaint would follow the rationale and determinations herein.

more pages of additional letter submissions.  The Court held oral argument on the motions on June 20, 2014.  (ECF No. 494.)

Prior to oral argument, the Court requested—and the parties kindly provided—a factual tutorial on the structure of the industry.  This was explicitly (according to the ground rules set by the Court, ECF No. 302) of no evidentiary significance.  Instead, it was to provide the Court with a basic understanding of industry players and their respective roles, normative supply/demand dynamics, pricing structure, and aluminum fabrication, distribution and sale.

The Court has spent significant time in consideration of the motions before it.  The complaints allege, and on this motion the Court accepts as true, that between 2009 and 2012 (which is what the FLPs' and Consumer End Users' complaints refer to as the "Class Period") (FLP Compl. ¶ 1 (May 1, 2009 forward); Cons. Compl. ¶ 1 (May 1, 2009 forward)), inefficiencies developed in aluminum pricing.[3]  Traders became the primary purchasers of LME warrants and futures contracts for aluminum.  LME stored aluminum in the Detroit area determines the level of the Midwest Premium.  As trader rather than user dynamics took root in the LME warehouses, the level of the Premium became driven by trading dynamics rather than actual supply and demand of aluminum users.  These dynamics included the arbitrage opportunity presented by decreased demand due to the severe market downturn, followed by the expectation of higher prices in the future.  This "buy low now to sell higher later" view of LME traded aluminum is alleged to have led

---

[3] The Commercial End Users allege a class period that spans the period from February 1, 2010 forward. (Comm. Compl. ¶ 204.)

defendants to take actions designed to maximize their profits—including obtaining and retaining large inventories of aluminum traded by warrants and futures contracts (the plaintiffs do not allege that any defendant was a user of aluminum), and creating load-out queues and delays. A direct result of this was to increase storage duration, thus storage costs, thereby increasing the Midwest Premium.

The economics of this arbitrage opportunity as alleged by plaintiffs are self-evident. That warehouses which make money from storage found longer storage durations desirable is only sensible. Why, indeed, would they want anything else? That traders, who would close out of a position to lock in arbitrage profits were benefitted by holding to a temporal point when such opportunity was maximized, is also self-evident. But why traders or warehouse operators would care to, or want to, increase the Midwest Premium which impacts contractual prices users might pay, is not at all clear.[4] That the combined actions of traders and warehouses to maximize their profits negatively impacted downstream purchasers through a rise in the Midwest Premium is clear—but as cast in the complaints, this was an unintended consequence of rational profit maximizing behavior rather than the product of conspiratorial design.

For the reasons set forth below, the Court finds that the Commercial and Consumer End Users lack antitrust standing, and their actions are therefore dismissed and leave to replead is denied as futile. The actions by the FLPs, Mag,

---

[4] There may well be an economically necessary interaction between the value of trading positions in aluminum and actual usage. However, none of the allegations in the various complaints describe if, how or why that exists. In the absence of such allegations, there is a break in the chain between the actions of the defendants here and the plaintiff users.

4

and Agfa are dismissed with leave to submit a proposed amended complaint not later than 21 days from the date of this order. If defendants object to the proposed filing, they shall have 21 days within which to submit memoranda setting forth any reasons; plaintiffs shall thereafter have 21 days to oppose; and defendants shall have 14 days thereafter for any reply.

## I.     FACTUAL ALLEGATIONS

On these motions to dismiss, the Court accepts the factual allegations in the complaints as true. Jaghory v. N.Y. State Dep't of Educ., 131 F.3d 326, 329 (2d Cir. 1997). The Court does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), nor will it give effect to "legal conclusions couched as factual allegations," Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007). Unless otherwise stated, each factual allegation set forth below is contained in one form or another in each of the operative complaints.[5]

In deciding a Rule 12(b)(6) motion, the Court may consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000), as well as documents that are integral to the complaint and relied upon in it, even if not attached or incorporated by reference, Broder v. Cablevision Sys. Corp., 418 F.3d 187, 196 (2d Cir. 2005). The Court may also properly consider matters of public record of which it may take

---

[5] There are certain instances in which allegations are of necessity limited to the particular level of the supply/distribution chain referenced in a particular complaint. For instance, allegations relating to the roles and businesses of the Commercial End Users and Consumer End Users are found only in their respective complaints.

judicial notice.  <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007) (court may consider "matters of which a court may take judicial notice" on a Rule 12(b)(6) motion to dismiss); <u>Blue Tree Hotels. Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.</u>, 369 F.3d 212, 217 (2d Cir. 2004) ("[W]e may also look to public records . . . in deciding a motion to dismiss.").

A.    <u>The U.S. Aluminum Market</u>

1.    <u>Overview</u>

Aluminum is the most abundant metal on earth.  (FLP Compl. ¶ 9; Cons. Compl. ¶ 40.)  It is used in a variety of industries such as construction and manufacturing, and it is a component of many household and consumer products. (Agfa Compl. ¶ 3; Mag Compl. ¶ 3; Cons. Compl. ¶¶ 40-43; <u>see</u> Comm. Compl. ¶¶ 9, 49.)  Aluminum enters the stream of commerce when large, integrated producers of aluminum (such as Alcoa and Rio Tinto Alcan) mine the mineral-rich rock bauxite, extract alumina from it, and then refine the extracted alumina into aluminum. (Agfa Compl. ¶ 31; Comm Compl. ¶ 46; Cons. Compl. ¶ 40; Mag Compl. ¶ 30.)  This "primary aluminum" may then be bought by independent mills, cable companies, and extruders, who then roll, draw, or extrude it into sheets, rods, and other forms, which they then sell.  (Agfa Comp. ¶ 32; Comm. Compl. ¶ 48; Mag Compl. ¶ 31.) But producers are not the only sellers of primary aluminum; American companies that use aluminum may acquire it from a producer, an independent mill, a trader or distributor, or warehouses that hold aluminum stock.  (Agfa Comp. ¶ 31; Mag Compl. ¶ 32.)

Since 2008, global aluminum production has fluctuated between approximately 37.5 million and 51 million tonnes[6] per year. (Agfa Compl. ¶¶ 34-36; Mag Compl. ¶¶ 33-35.) Annual production is typically in the vicinity of 44 million tonnes. (See Agfa Compl. ¶ 36; Mag Compl. ¶ 35.) In each of these years, global production of aluminum has exceeded global consumption, resulting in a surplus of aluminum. (Agfa Comp. ¶ 36; Mag Compl. ¶ 35.) According to the FLPs, the United States actually consumes three times more aluminum than it produces. (FLP Compl. ¶ 303.) In 2011, the U.S. produced approximately 2 million tonnes and consumed about 4 million tonnes. (Agfa Compl. ¶¶ 34-35; Mag Compl. ¶¶ 33-34.)

The United States is, accordingly, a net importer of aluminum. None of the complaints, however, describe the extent to which aluminum in any particular geography is or could be obtained from another; the extent to which the price, supply, and demand of aluminum are elastic; the extent to which the plaintiffs are contractually obligated to pay prices incorporating the Midwest Premium; or whether they have other commercial options. It is unclear, for instance, whether aluminum produced and/or fabricated overseas would be subject to the Midwest Premium, or whether its acquisition by United States purchasers would be economically feasible.

2.    Aluminum Pricing

The price of aluminum is usually set via a formula rather than a price certain negotiated by the buyer and seller. (Agfa Comp. ¶ 4; Mag Compl. ¶ 4.) In the

---

[6] A "tonne" is a metric ton (1000 kilograms). It is approximately 110.2% of an American ton.

Midwest and other parts of the United States, plaintiffs have paid a common, standardized benchmark price for aluminum consisting of the cash price of aluminum purchased on the LME (the LME "Cash Price") plus the "Midwest Premium" (also referred to as the "Platts Premium"). (FLP Compl. ¶ 12; see also Comm. Compl. ¶ 6; Cons. Compl. ¶ 118.) The LME Cash Price is derived from the LME "Official Price," defined as the "last bid and offer price quoted during the second Ring session"[7] of the LME and which is quoted for cash (i.e., spot purchase), three and fifteen month "prompts," and three forward December "prompts."[8] (Mag Compl. ¶ 38; see also Agfa Compl. ¶ 4 n.5; Comm. Compl. ¶ 113 n.4.) The LME Official Price is used as a global benchmark for physical contracts for the delivery of aluminum. (Agfa Compl. ¶ 39; Mag Compl. ¶ 38; see also Comm. Compl. ¶ 6; Cons. Compl. ¶ 65.) The LME Cash Price is simply the LME Official Price quoted for cash. (See Agfa Compl. ¶ 39; Mag Compl. ¶ 38.) The process of pricing aluminum through LME trading is referred to as "price discovery." (Agfa Compl. ¶ 41; Mag Compl. ¶ 40; see FLP Compl. ¶ 151.) Notably, this pricing does not include the costs of delivery from seller to purchaser. (Agfa Compl. ¶ 41; Mag Compl. ¶ 40; see FLP Compl. ¶ 11.)

The Midwest Premium consists of the accumulated transport and storage costs associated with the delivery of aluminum to the Midwestern United States.

---

[7] The LME's open-outcry trading floor is referred to as the "Ring." There are two trading sessions daily. (Agfa Compl. ¶ 39 n.15; Comm. Compl. ¶ 113 n.4; Mag Compl. ¶ 38 n.19.)

[8] On the LME, the "prompt date" is the "date by which an LME warrant must be delivered by the seller and paid for by the buyer of a futures contract," and is also known as the "settlement date." Contract Types, London Metal Exch., https://www.lme.com/trading/contract-types/ (last visited Aug. 21, 2014.)

(Agfa Compl. ¶¶ 4, 40; Comm. Compl. ¶ 6; Cons. Compl. ¶ 120; Mag Compl. ¶¶ 4, 39.)  The Midwest Premium fluctuates based on the dynamics of supply and demand and changes in transport and storage costs.  (Agfa Compl. ¶ 40; Mag Compl. ¶ 39; see also Comm. Compl. ¶ 104; Cons. Compl. ¶¶ 5(c), 65-66.)  A private publishing company, Platts, publishes a measure of the Midwest Premium based on data it collects from buyers and sellers of aluminum.  (Agfa Compl. ¶ 40; Comm. Compl. ¶ 57; FLP Compl. ¶ 155; Mag Compl. ¶ 39.)  The Midwest Premium reflects current offers for immediately available aluminum for delivery from both U.S. and foreign producers, traders, and holders of warehoused aluminum; these offers incorporate the fluctuating delivery, storage, finance and insurance costs incurred by purchasers.  (Agfa Compl. ¶ 42; Mag Compl. ¶ 41; see also Comm. Compl. ¶ 6 n.2.)  The price any particular purchaser pays for aluminum may also reflect the addition of fabrication or "shaping" premiums.  (Agfa Compl. ¶ 4; Mag Compl. ¶ 4.)

The Midwest Premium began to increase in 2009.  (Agfa. Compl. ¶ 72; FLP Compl. ¶ 16; Mag Compl. ¶ 71; see also Comm. Compl. ¶ 112; Cons. Compl. ¶¶ 68-69.)  It was significantly less than $115 per ton in 2010, but it subsequently increased to $250 or more per ton.  (Cons. Compl. ¶ 101; FLP Compl. ¶ 217.)  Put another way, since 2008 it has increased from 3% to over 14% of the LME Cash Price.  (Agfa Compl. ¶ 72; Mag Compl. ¶ 71.)

### 3. Inventory Increases During the Great Recession

From the fall of 2007 through 2009, the United States experienced the worst recession and housing downturn since the Great Depression.[9] (See Agfa Compl. ¶ 71; Cons. Compl. ¶ 109; Mag. Compl. ¶ 70.) In 2008, stocks of aluminum began increasing sharply as a result of this recession. (See Agfa Compl. ¶ 53; Comm. Compl. ¶ 117; FLP Compl. ¶ 14(c); Mag Compl. ¶ 52.) The availability of financing for commodities transactions also decreased, leading producers and others in the aluminum supply/distribution chain to convert their available inventories of aluminum into cash by selling them, often to traders. (Agfa Compl. ¶ 53; Mag Compl. ¶ 52.) Aluminum warehouses in the greater Detroit area affiliated with the London Metal Exchange saw their inventory levels increase to "all-time record levels," rising sharply in 2008 and maintaining a steady incline through 2012, with some minor ups and downs along the way. (FLP Compl. ¶¶ 20-21; see also Comm. Compl. ¶ 97; Cons. Compl. ¶ 97; Mag Compl. ¶ 50.) However, there were no material spikes in these inventories between February 2010 and September 2012. (See FLP Compl. ¶ 21; see also Agfa Compl. ¶ 51; Comm. Compl. ¶ 97; Cons. Compl. ¶ 97; Mag Compl. ¶ 50.).

### 4. The London Metal Exchange

The London Metal Exchange ("LME") is the world's largest non-ferrous metals market. (Agfa Compl. ¶ 25(a); Mag. Compl. ¶ 24(a).) More than 80% of the world's non-ferrous metals futures business is transacted through the LME's

---

[9] See Stanley Fischer, The Great Recession: Moving Ahead (Aug. 11, 2014) (speech), available at http://www.federalreserve.gov/newsevents/speech/fischer20140811a.htm (last update Aug. 11, 2014).

trading platforms and the LME handles total combined trading volumes for all metals of approximately $61 billion per day.[10]  (Agfa Compl. ¶ 25(a); Comm. Compl. ¶ 27;  FLP Compl. ¶ 126; Mag Compl. ¶ 24 (a).)  It is the sole venue for exchange-traded aluminum futures or aluminum forward contracts in the United States. (Comm. Compl. ¶ 27; Cons. Compl. ¶ 46; FLP Compl. ¶ 9.)

Until December 6, 2012, LME Holdings Limited ("LME Holdings") owned the LME.  (Comm. Compl. ¶ 28; Cons. Compl. ¶ 34; FLP Compl. ¶ 127.)  On that day, the LME was purchased by Hong Kong Exchanges and Clearing Limited, which owns the HKEx Group, an integrated trading exchange based in Hong Kong for in excess of $2 billion.  (Agfa Comp. ¶25(a); Comm. Compl. ¶ 28; Cons. Compl. ¶ 34; FLP Compl. ¶¶ 27, 127-29; Mag Compl. ¶ 24.)  Until the LME was acquired by the HKEx Group at the end of 2012, it had been owned by its members.  (Agfa Compl. ¶ 25(b); Cons. Compl. ¶ 48; FLP Compl. ¶ 406; Mag Compl. ¶ 24(b).)  Among its previous owner-members were several subsidiaries of defendants here, Goldman Sachs International (a subsidiary of the Goldman Sachs Group Inc. ("Goldman Sachs")), J.P. Morgan Securities PLC (a subsidiary of JP Morgan Chase & Co. ("JP Morgan")), and Glencore (UK) Ltd. (a subsidiary of Glencore Xstrata plc ("Glencore")).  (Agfa Compl. ¶ 25(b); FLP Compl. ¶ 406; Mag Compl. ¶ 24(b).)  As a result of the sale of their interests in the LME, Goldman Sachs was paid $208 million and JP Morgan was paid $260 million.  (FLP Compl. ¶ 27; <u>see also</u> Comm. Compl. ¶ 86; Cons. Compl. ¶ 102.)

---

[10] The LME trades in aluminum, aluminum alloy, copper, tin, nickel, zinc, lead, NASAAC, cobalt and molybdeneum.  (Agfa Compl. ¶ 25(a); Mag Compl. ¶ 24 (a).)

The LME groups its members into five categories.  (See Agfa Compl. ¶ 25(b); Cons. Compl. ¶ 49; Mag Compl. ¶ 24(b).)  Goldman Sachs, Glencore, and JP Morgan each fall into different categories.  (Agfa Comp. ¶ 25(b); Cons. Compl. ¶ 49; Mag Compl. ¶ 24(b).)  Much of the work of the LME is done through various committees composed of, inter alia, members and/or their affiliates.  (Agfa Compl. ¶ 25(c); FLP Compl. ¶ 360; Mag Compl. ¶ 24 (c); see also Comm. Compl. ¶ 227.)

Aluminum is traded on the LME through the purchase and sale of futures (or forward) contracts.  (FLP Compl. ¶ 145; see also Cons. Compl. ¶ 163.)  An LME futures contract represents a promise by the seller to deliver a quantity of aluminum to a buyer on a certain future date.  (See Agfa Compl. ¶ 45; FLP Compl. ¶ 146; Mag Compl. ¶ 44; see also Comm. Compl. ¶ 53; Cons. Compl. ¶ 54.)  The delivery by the seller (or "short") of a "warrant" to the buyer (or "long") represents delivery of the corresponding quantity of physical aluminum.  (See Agfa Compl. ¶ 45; Comm. Compl. ¶ 53; Cons. Compl. ¶ 54; FLP Compl. ¶¶ 146, 148; Mag Compl. ¶ 44.)  A "warrant" is a standard, bearer document of title, corresponding with a particular lot of metal in the warehouse; it specifies the lot's brand, type of metal, warehouse, and location.  (Agfa Compl. ¶ 45; FLP Compl. ¶ 146; Mag Compl. ¶ 44; see also Comm. Compl. ¶ 53; Cons. Compl. ¶ 53.)  Warrants are not interchangeable (Comm. Compl. ¶ 53; Cons. Compl. ¶ 53; FLP Compl. ¶ 146), but they are standardized, which makes them fungible and therefore freely tradeable (Agfa Compl. ¶ 45; Mag Compl. ¶ 44; see also Comm. Compl. ¶ 53).  As a result, there is an ongoing swapping and trading of warrants for aluminum in different

warehouses.  (See Agfa Compl. ¶ 45; Mag Compl. ¶ 44.)  Yet the vast majority of aluminum traded on the LME is never physically transferred to a user; instead, when a futures contract comes due on its prompt date, it is "settled" with an off-setting trade.  (FLP Compl. ¶ 149.)[11]  More than 99% of the LME aluminum contracts are satisfied or liquidated by offsetting trades.  (Comm. Compl. ¶ 54; FLP Compl. ¶ 149.)  It is through this trading process that price discovery on the LME occurs.  (FLP Compl. ¶ 151.)

In the remaining 1% of LME futures transactions (those not settled through offsetting trades), if the seller owns more than a single warrant (as typically will be the case), it has the choice of which warrant (and therefore which corresponding lot of aluminum) it wants to deliver on the prompt date.  (FLP Compl. ¶ 152.)  Since the seller has the ability to choose which warrant to settle, the price of LME forward contracts is influenced by the least valuable warrant in all of the LME warehouses globally.  (FLP Compl. ¶¶ 152-53.)  LME aluminum futures contracts are determined by many other factors as well, including the fundamentals of supply and demand, trading perceptions in the market, and other factors including, inter alia, strategic bidding by traders.  (FLP Compl. ¶ 154.)  In the United States, 97% to 99% of all aluminum futures contract trading is conducted on the LME.  (Comm. Compl. ¶ 52; Cons. Compl. ¶ 163; FLP Compl. ¶ 154.)  The vast majority of aluminum trading activity on the LME takes place among banks, hedge funds and traders, rather than users of aluminum.  (Agfa Comp. ¶ 25(a); Mag Compl. ¶ 24(a).)

---

[11] A large amount of the inventory in Detroit area warehouses is owned by hedge funds, banks, and traders.  (Agfa Compl. ¶ 59; FLP Compl. ¶ 383; Mag Compl. ¶ 58.)

In conjunction with its operation of the aluminum futures trading platform, the LME approves and lists a global network of more than 700 warehouses worldwide ("LME warehouses" or "LME-approved warehouses"). (Agfa Compl. ¶¶ 6, 25(e); Comm. Compl. ¶ 27; Mag Compl. ¶¶ 6, 24(e); see also Cons. Compl. ¶¶ 51-52.) The LME has agreements with the owners of these warehouses. (Comm. Compl. ¶ 189; FLP Compl. ¶ 285.) Approximately 200 of those warehouses are located in the United States, including the Midwest. (Agfa Compl. ¶ 43; Mag Compl. ¶ 42; see FLP Compl. ¶¶ 19-20.) The LME's storage network holds over five million tonnes of aluminum in LME warehouses worldwide, more than the total amount of aluminum consumed in the United States in a year. (Agfa Compl. ¶ 6; Mag Compl. ¶ 6.) LME warehouses are suppliers of last resort to users of physical aluminum. (Agfa Compl. ¶ 46; Comm. Compl. ¶ 115; FLP Compl. ¶ 17; Mag Compl. ¶ 45.)

Only LME warehouses may deliver and cancel warrants for LME-traded aluminum. (Agfa Compl. ¶ 45; FLP Compl. ¶ 380; Mag Compl. ¶ 44.) The LME certifies, approves and enters into agreements with LME warehouse operators. (Cons. Compl. ¶ 83; FLP Compl. ¶ 156.) It had such agreements with Metro International Trade Services LLC ("Metro") during the Class Period. (FLP Compl. ¶ 156.) The LME's agreements with Metro were reflected in two key documents: (1) the LME Warehouse Notice Terms and Conditions, and (2) the LME Warehouse Notice Disciplinary Handbook. (Cons. Compl. ¶ 86; FLP Compl. ¶ 158.)

An LME warehouse may only issue a warrant once a specific lot of aluminum has been delivered or "checked into" the warehouse.  (See Agfa Compl. ¶ 45; Mag Comp. ¶ 44)  The cancellation of a warrant leads to the lot being earmarked for delivery out of the warehouse.  (Agfa Compl. ¶ 45; FLP Compl. ¶ 147; Mag Compl. ¶ 44.)  Once the warrant is cancelled, the load-out process begins (FLP Compl. ¶ 170), and the lot is placed in line to be loaded out of the warehouse and transported to its owner's chosen destination (see FLP Compl. ¶¶ 215, 252).

Warehouses earn revenues from storage fees; thus, increased inventory leads to increased revenue, and increasing the average duration of storage increases revenues.  (See Comm. Compl. ¶ 67; FLP Compl. ¶¶ 22-23.)  The LME shares in the storage revenues of its approved warehouses.  (See Comm. Compl. ¶ 67; Cons. Compl. ¶ 51; FLP Compl. ¶ 24.)

B.    The Parties

1.    Defendants[12]

Defendants consist of LME Holdings,[13] a group of financial and trading entities (the "trader defendants"), and companies that own and operate certain LME warehouses (the "warehouse defendants").[14]

---

[12] In their complaints, plaintiffs frequently make allegations regarding affiliated entities under a single name.  For instance, plaintiffs sometimes refer to "Goldman" when it is clear that Metro is the legal entity whose actions are described.  (See, e.g., FLP Compl. ¶ 158.)  As there are no allegations suggesting any lack of attention to corporate formalities, the grouping of entities in this manner is without support and is therefore conclusory.  Grouping entities without providing factual support for doing so (other than the mere fact of common ownership) cannot support specific references to specific entities, which are necessary for the Court to evaluate the sufficiency of the allegations.  Thus, where possible, the Court references the specific entity that is the subject of the factual allegations.

[13] The London Metal Exchange Limited ("LME Ltd.") has also filed a motion to dismiss all complaints on the merits.  (ECF No. 333.)  On August 25, 2014, the Court granted LME Ltd.'s motion

a) The Trader Defendants

Goldman Sachs is a global investment banking, securities, and investment management firm. (Comm. Compl. ¶ 29; Cons. Compl. ¶ 20; FLP Compl. ¶ 116.) It was a shareholder of the LME during the Class Period until the HKex Group acquired the LME in December 2012. (Agfa Compl. ¶ 25(b); Comm. Compl. ¶ 29; Cons. Compl. ¶ 20; FLP Compl. ¶ 117; Mag Compl. ¶ 24(b).)

Glencore[15] is a commodities trading and mining company that engages in the production, storage, transportation, marketing, and trading of aluminum and other metals. (Agfa Compl. ¶ 22; Comm. Compl. ¶ 35; Cons. Compl. ¶ 28; FLP Compl. ¶ 132; Mag Compl. ¶ 21.)[16]

JP Morgan is an investment bank and financial services firm incorporated in Delaware with its principal place of business in New York. (Cons. Compl. ¶ 24; FLP Compl. ¶ 137; see also Agfa Compl. ¶ 20; Comm. Compl. ¶ 32; Mag Compl. ¶ 19.) Blythe Masters, the head of JP Morgan's commodities business, is alleged to have stated, "[j]ust being able to trade financial commodities is a serious limitation because financial commodities represent only a tiny fraction of the reality of the real commodity exposure picture . . . . We need to be active in the underlying

---

to dismiss on sovereign immunity grounds. (ECF No. 564.) Accordingly, the LME's motion to dismiss all complaints on the merits is DENIED AS MOOT.

[14] The FLPs also allege that one or more Jane Doe defendants may have been participants in the unlawful conspiracy, and/or that plaintiffs may have purchased aluminum from such entities. (See FLP Compl. ¶¶ 142-44.) But the allegations are unspecific as to the Jane Doe defendants' position in the supply/distribution chain, or even what kinds of entities they are.

[15] Glencore Ltd. is a wholly owned subsidiary of Glencore based in Connecticut. (Cons. Compl. ¶ 29; FLP Compl. ¶ 135.)

[16] Glencore Xstrata plc was created by a merger of Glencore International, PLC and Xstrata in May 2013. (FLP Compl. ¶¶ 131-32; see also Agfa Compl. ¶ 22; Cons. Compl. ¶ 28; Mag Compl. ¶ 21.)

physical commodity market in order to understand <u>and make prices</u>." (Agfa Compl. ¶ 56; Comm. Compl. ¶ 66; Cons. Compl. ¶ 72; FLP Compl. ¶ 379; Mag Compl. ¶ 55 (emphasis in original).)

Although the Class Period is from 2009 forward, Goldman Sachs, JP Morgan, and Glencore did not purchase LME warehouses until 2010. (<u>See</u> Agfa Compl. ¶55; FLP Compl. ¶¶ 134, 138, 157; Mag Compl. ¶ 54.)

b) The Warehouse Defendants

Metro is a global LME warehouse operator. (FLP Compl. ¶ 122.) In February 2010, it was acquired by subsidiaries of Goldman Sachs, which was a shareholder in the LME. (FLP Compl. ¶¶ 117, 157; <u>see also</u> Agfa Compl. ¶ 55; Comm. Compl. ¶ 106; Cons. Compl. ¶ 22; Mag Compl. ¶ 54.) GS Power Holdings LLC ("GS Power") is a subsidiary of Goldman Sachs. (Comm. Compl. ¶ 31; Cons. Compl. ¶ 22; FLP Compl. ¶ 118.) MCEPF Metro I, Inc. ("MCEPF Metro") is also a wholly owned subsidiary of Goldman Sachs. (FLP Compl. ¶ 119.) GS Power and MCEPF Metro together jointly own Mitsi Holdings LLC ("Mitsi"). (Cons. Compl. ¶ 22; FLP Compl. ¶ 120.) Mitsi directly owns Metro. (Cons. Compl. ¶ 22; FLP Compl. ¶ 121.) Together, plaintiffs refer to this group of Goldman-related entities as the "Goldman defendants." (Comm. Compl. intro.; Cons. Compl. ¶ 23; FLP Compl. ¶ 123.)

Defendant Pacorini Metals AG ("PMAG") has its principal place of business in Switzerland. (Cons. Compl. ¶ 30; FLP Compl. ¶ 133.) It was acquired by Glencore in September 2010. (FLP Compl. ¶ 134; <u>see also</u> Agfa Compl. ¶ 22; Mag Compl. ¶ 21.) PMAG owns and operates a U.S.-based subsidiary, Pacorini Metals

USA, LLC ("PMUSA"), which owns and operates LME warehouses that store aluminum in Baltimore, Chicago, Detroit, Los Angeles, Mobile and New Orleans. (Agfa Compl. ¶ 23; Comm. Compl. ¶ 36; FLP Compl. ¶ 134; Mag Compl. ¶ 22; <u>see also</u> Cons. Compl. ¶ 30.)

In February 2010, JP Morgan acquired Henry Bath & Son Limited ("Henry Bath"), a U.K.-based metals warehousing company that owns and operates 93 metals warehouses and storage facilities around the world. (Comm. Compl. ¶ 33; FLP Compl. ¶¶ 138-39; <u>see also</u> Agfa Compl. ¶¶ 20-21; Mag Compl. ¶¶ 19-20.) Henry Bath is the corporate parent of defendant Henry Bath LLC, an international logistics provider specializing in the storage and shipping of exchange-traded metals. (Comm. Compl. ¶ 34; FLP Compl. ¶¶ 139-40; <u>see also</u> Agfa Compl. ¶ 21; Cons. Compl. ¶ 25; Mag Compl. ¶ 20.)

There are 37 LME warehouses in the greater Detroit area, of which 29 are owned by Metro, which together account for 80% of LME warehouse space in the greater Detroit area. (FLP Compl. ¶ 159.) There are no allegations that Henry Bath owns any warehouses in the Detroit area; PMUSA is alleged to own warehouses there (<u>see, e.g.</u>, Agfa Compl. ¶ 23; Comm. Compl. ¶ 36; Mag Compl. ¶ 22), but it is not alleged to have had warehouses with any significant increase in load-out delays or queues during the period from 2009 forward in the Detroit area.

### 2. Plaintiffs

#### a) "First-Level Purchasers"

Plaintiffs Ampal, Inc., Admiral Beverage Corp., Central Aluminum Company ("Central Aluminum"), Claridge Products and Equipment, Inc., Custom Aluminum Products, Inc., Extruded Aluminum Corporation, International Extrusions, Inc. ("International Extrusions"), Talan Products Inc. ("Talan") and Thule, Inc. are manufacturers that use aluminum to make, inter alia, aluminum powder, aluminum extrusions, bottled beverages, or consumer products like bike carriers, cabinets, and strollers.  (FLP Compl. ¶¶ 105-15.)  They are based in states as diverse as Arkansas, Connecticut, Ohio, and Wyoming.  (See FLP Compl. ¶¶ 105-15.)

These plaintiffs allege that they made "first level direct purchases" of primary aluminum products pursuant to written contracts in which the purchase price was based on the Midwest Premium.  (FLP Compl. ¶¶ 105-11, 113, 115.)  All but Central Aluminum, International Extrusions, and Talan allege that they may also have purchased aluminum directly from a Jane Doe defendant during the Class Period.  (See FLP Compl. ¶¶ 105-15.)

The FLPs allege seven causes of action:  Count One alleges a violation of Section 1 of the Sherman Act against the LME, Goldman Sachs, and Jane Doe defendants; Count Two alleges a violation of Section 2 of the Sherman Act against the LME, Goldman Sachs, and Jane Doe defendants; Count Three alleges a violation of Section 1 of the Sherman Act against all defendants; Count Four alleges

a violation of Section 2 of the Sherman Act against all defendants; and Counts Five through Eight are state law equivalent claims under the laws of 34 states and the District of Columbia.  (FLP Compl. ¶¶ 328-431.)

>   b)   Mag and Agfa

Mag designs, manufactures and sells durable flashlights.  (Mag Compl. ¶ 16.) All mag flashlights are manufactured in the United States using aluminum.  (Mag Compl.)  Mag purchased aluminum pursuant to a long-standing supply contract, the price of which was calculated according to a fixed cost-plus formula that relied in part on the Midwest Premium.  (Mag Compl. ¶ 16(a).)

Mag purchased its aluminum from Norsk Hydro North America, Inc. ("Hydro"), an aluminum producer and extruder.  (Mag Compl. ¶ 16(a).)  Hydro was a member of the LME.  (Mag Compl. ¶ 16(b).)[17]  Thus, until the LME was sold to Hong Kong Exchanges and Clearing Limited in December 2012, Hydro was a part-owner of the LME, along with defendants Goldman Sachs, JP Morgan and Glencore. (Mag Compl. ¶ 16(b).)  Hydro's corporate parent sits on the LME's Aluminum Committee, along with defendants Glencore and JP Morgan.  (Mag Compl. ¶ 16 (c).)

Agfa develops, produces, and distributes equipment and supplies such as lithographic printing plates for the newspaper, commercial printing, and graphics communication industries.  (Agfa Compl. ¶ 17.)  It has a production facility in the United States, and its U.S. headquarters are located in New Jersey.  (Mag Compl. ¶ 17.)  Agfa purchased aluminum from integrated producers such as Alcoa and Hydro

---

[17] Hydro is not a defendant in any of these coordinated and consolidated lawsuits.

at all times material to its complaint. (Mag Compl. ¶ 17.) The price Agfa paid for such aluminum purchases was based upon the Midwest Premium. (Mag Compl. ¶ 17.)

Mag and Agfa have filed mirror complaints. (<u>Compare</u> Agfa Compl., <u>with</u> Mag Compl.) They are coordinated with the other plaintiffs for pre-trial purposes but have elected not to consolidate into one of the other complaints. Each asserts a violation of Section 1 of the Sherman Act against all defendants as its First Claim for Relief (Agfa Compl. ¶¶ 123-29; Mag Compl. ¶¶ 113-19), a violation of California's Cartwright Act as its Second Claim for Relief (Agfa Compl. ¶¶ 130-36; Mag Compl. ¶¶ 120-26). Mag also asserts various related claims under California state law. (Mag Compl. ¶¶ 127-49.)

c) End Users

The Consumer End User plaintiffs are two residents of California (Daniel Javorsky and David Kohlenberg), and a pizzeria (Brick Pizzeria LLC), who indirectly purchased aluminum consumer products for end use (that is, not for resale.) (Cons. Compl. ¶¶ 17-19.)

The Commercial End User plaintiffs are businesses[18] who manufacture various products for resale and who purchased processed aluminum in connection therewith. (Comm. Compl. ¶¶ 18-26.) For instance, plaintiffs manufacture boats, machinery, pre-fabricated housing, patio and swimming pool enclosures, fabricated

_____

[18] The Commercial End User plaintiffs include: Big River Outfitters, LLC d/b/a SeaArk Boats ("SeaArk Boats"); D-Tek Manufacturing; F & F Custom Boats, LLC ("F & F"); Lexington Homes, Inc.; Master Screens, Inc. d/b/a Tropical Enclosures; Quicksilver Welding Services, Inc.; Seating Constructors USA, Inc.; Team Ward, Inc. d/b/a War Eagle Boats; and Welk-ko Fabricators, Inc. (Comm. Compl. ¶¶ 18-26.)

home railings and artworks, seating bleachers, cabinets, consoles, and rack panels. (Comm. Compl.)

The Commercial and Consumer End Users have alleged claims solely for injunctive relief under federal antitrust laws, and damages under state law. (Comm. Compl.; Cons. Compl.)

Both the Commercial and Consumer End User plaintiffs have asserted violations of Section 1 of the Sherman Act against all defendants as their First Claims for Relief and violations of Section 2 of the Sherman Act as their Second Claims for Relief. (Comm. Compl. ¶¶ 216-35; Cons. Compl. ¶¶ 195-210.) The Consumer End User plaintiffs also include a claim for attempted monopolization (their Third Claim), and violations of state antitrust and unfair competition laws (their Fourth through Eleventh Claims). (Cons. Compl. ¶¶ 211-326.) The Commercial End Users also allege violations of state antitrust, consumer protection, and unfair competition statutes (their Third through Fifth Claims.) (Comm. Compl. ¶¶ 272-309.)

C.    Defendants' Allegedly Unlawful Conduct

1.    Exploitation of inefficient loading-out.

Plaintiffs allege that between 2009 and March 31, 2012, defendants conspired to load-out aluminum inefficiently. (Comm. Compl. ¶ 76; FLP Compl. ¶ 31; see Cons. Compl. ¶ 92) That is, they allege that during the Class Period, the 37 LME warehouses in the Detroit area used the LME's 1500 ton per day minimum load-out requirement as a de facto maximum. (Agfa Compl. ¶ 67; Comm. Compl. ¶¶ 77-78;

22

Cons. Compl. ¶ 92; FLP Compl. ¶¶ 31, 32(f); Mag Compl. ¶ 66.)  This increased the average duration of storage for lots of aluminum stored in LME warehouses, increasing overall storage costs and leading to an increase in the Midwest Premium. (See FLP Compl. ¶ 33.)

Between 2009 and March 31, 2012, companies that owned LME warehouses were required to load-out 1,500 tons of aluminum per city per day.  (See Agfa Compl. ¶¶ 67-68; Cons. Compl. ¶ 59; FLP Compl. ¶¶ 31, 44, 164; Mag Compl. ¶¶ 66-67; see also Comm. Compl. ¶ 77.)  Because this minimum load-out rule applied on a per-city basis, if a single warehouse operated more than one warehouse in a city, it could satisfy its obligation by loading-out from a single warehouse.  (Cons. Compl. ¶ 62; FLP Compl. ¶ 165.)  The 1,500-ton load-out rule did not net out load-ins.  (Cons. Compl. ¶ 88; FLP Compl. ¶ 164; see also Comm. Compl. ¶ 187.)  Accordingly, a warehouse could end up with more aluminum in its inventory at the end of a day than at the beginning.  Plaintiffs allege that a low minimum load-out obligation, the absence of a per-warehouse load-out requirement, combined with a lack of any rule requiring the netting out of load-ins, resulted in an unreasonable restraint of trade. (Cons. Compl. ¶¶ 88-89; FLP Compl. ¶ 165.)  There is no allegation as to when the "minimum load-out," "per city," or "no net load-in" rules were adopted or implemented, by which committee or who constituted the membership of that committee at the time.[19]

---

[19] The timing could materially affect the plausibility of plaintiffs' claims.

Starting in the latter part of 2009, the inventories of Metro's warehouses began to exhibit an unusual and historically anomalous pattern: warrants would steadily and substantially accumulate, with spikes of multiple cancellations of warrants. (FLP Compl. ¶ 161.) This pattern continued to occur after Goldman Sachs' subsidiaries acquired Metro in February 2010. (See FLP Compl. ¶ 162.) According to Agfa's and Mag's complaints, such cancellations were intended to create additional bottlenecks and thereby increase delays of load-outs, and to allow them to shuttle aluminum between warehouses. (See Agfa Compl. ¶¶ 88-93; Mag Compl. ¶¶ 87-92.)

During 2010, Metro allegedly began treating the LME's 1,500-ton-daily minimum load-out rule as a de facto maximum daily load-out limit. (See FLP Compl. ¶ 168.) Plaintiffs allege that the LME has "continuously acquiesced, consented, and otherwise agreed to this 'maximum' interpretation of the [rule] since 2010." (FLP Compl. ¶ 169; see also Comm. Compl. ¶ 78; Cons. Compl. ¶ 139.)

Since load-outs only occur with respect to metal corresponding to cancelled warrants (see FLP Compl. ¶ 147; see also Agfa Compl. ¶ 45; Comm. Compl. ¶ 69; Cons. Compl. ¶ 53; Mag Compl. ¶ 44), the first step in queue development is warrant cancellation. Plaintiffs allege that in order to increase their aluminum inventories, the warehouse defendants would cancel warrants, transfer the stock to themselves or their affiliates, and then simply reinstate the warrant at the next warehouse. (Agfa Compl. ¶ 59; FLP Compl. ¶¶ 382-83; Mag Compl. ¶ 58; see also Comm. Compl. ¶¶ 88, 187, 193; Cons. Compl. ¶ 4.) Warrant cancellation activity

increased once Goldman Sachs, JP Morgan and Glencore entered the aluminum warehousing industry by way of acquisition.  (Agfa Compl. ¶ 60; FLP Compl. ¶ 382; Mag Compl. ¶ 59.)

Sometime in 2009 or 2010, the delivery of aluminum at LME warehouses began to be handled by skeleton crews, approval became required for overtime work, and warehouse employees were no longer permitted to work Saturdays, as they previously had done.  (FLP Compl. ¶ 173.)  These factors contributed to the creation of queues.

Metro also allegedly began loading-out aluminum from one Detroit-area warehouse only to transport it to another of its warehouses in the same area.  (Agfa Compl. ¶ 91; FLP Compl. ¶ 174; Mag Compl. ¶ 90; see also Comm. Compl. ¶ 81, Cons. Compl. ¶ 95.)  Plaintiffs allege that this "shuttling" of aluminum also contributed to load-out queues.  (See FLP Compl. ¶ 175; see also Agfa Compl. ¶ 92; Mag Compl. ¶ 91.)  These delays have resulted in longer durations of storage and therefore higher storage fees.  (See generally FLP Compl.)

By 2011, load-out queues at the LME warehouses in the Detroit area were approximately 180 days long.  (FLP Compl. ¶ 179.)  From January to June 2011, Metro's Detroit area warehouses took in approximately 364,000 tons of aluminum but delivered out only approximately 171,000 tons.  (Agfa Compl. ¶ 62; Cons. Compl. ¶ 134; FLP Compl. ¶ 180; Mag Compl. ¶ 61.)

By 2011, there were public complaints regarding load-out delays in the Detroit area.  (See Agfa Compl. ¶¶ 94-95; Comm. Compl. ¶ 150; Cons. Compl. ¶ 167;

FLP Compl. ¶ 182; Mag Compl. ¶¶ 93-94.)  In 2011, the chief procurement officer for the world's largest aluminum can manufacturer estimated that the Detroit delays caused a $20 to $40 increase in the U.S. benchmark price per ton.  (Comm. Compl. ¶154; Cons. Compl. ¶ 133; FLP Compl. ¶¶ 184-86.)  In 2011, Coca-Cola Co. lodged a complaint with the LME.  (Agfa Compl. ¶ 95; Comm. Compl. ¶ 153; Cons. Compl. ¶ 136; FLP Compl. ¶ 190; Mag Compl. ¶ 94.)  In response to these complaints, the LME hired consultancy Europe Economics to study the queues and delays in Detroit-area warehouse load-outs.  (Agfa Compl. ¶ 76; Comm. Compl. ¶ 155; Cons. Compl. ¶ 116; FLP Compl. ¶ 193; Mag Compl. ¶ 75.)  That firm recommended that the minimum load-out rule be changed to scale with inventories.  (FLP Compl. ¶ 196; <u>see also</u> Agfa Compl. ¶ 80; Cons. Compl. ¶ 116; Mag Compl. ¶ 79.)

Plaintiffs also allege that Goldman or Metro International Trade Services, L.L.C. ("Metro"; together, "Goldman/Metro")[20] increased its inventories by offering incentive payments to aluminum producers.  (Comm. Compl. ¶¶ 61, 140; Cons. Compl. ¶ 5(g); FLP Compl. ¶¶ 212-13; <u>see also</u> Agfa Compl. ¶¶ 64-65; Mag Compl. ¶¶ 63-64.)  According to plaintiffs, this diverted aluminum from productive uses to long-term storage.  (FLP Compl. ¶ 213; <u>see</u> Agfa Comp. ¶ 59; Comm. Compl. ¶ 11; Mag Compl. ¶ 58; <u>see also</u> Cons. Compl. ¶ 101.)  Goldman/Metro offered to pay as much as $250 or more per ton in such up-front "incentive payments."  (Comm. Compl. ¶ 193; Cons. Compl. ¶ 5(g); FLP Compl. ¶ 214.)  According to plaintiffs,

---

[20] Plaintiffs' allegations with regard to incentive payments are cast in terms of "Goldman."  However, the other allegations of the complaints only support Metro as the operational arm of the Goldman-affiliated warehousing operations.  There are also no allegations in any complaint regarding how, who, when, or why any "Goldman" personnel would, could, or did communicate with Metro personnel with respect to warehouse operations.

Goldman's incentive payments created a positive feedback loop in which the more aluminum it could divert into its warehouses and the more inefficient it could be in loading-out, the more it earned and therefore the more it could afford to pay in incentive payments. (Cons. Compl. ¶ 101; FLP Compl. ¶ 216.)

Plaintiffs allege that defendants had no incentive to decrease queues during the period 2012-13 because they were in the process of trying to sell the LME, and therefore it was in their mutual self-interest to maintain high storage revenues. (Cons. Compl. ¶ 5(h); FLP Compl. ¶ 197.) Defendants allegedly agreed not to implement the recommendations of "their own paid consultants' proposed solution to the problem." (FLP Compl. ¶ 198; <u>see also</u> Agfa Compl. ¶ 82; Comm. Compl. ¶ 155; Cons. Compl. ¶ 117; Mag Compl. ¶ 81.)[21]

In total, LME warehouses' inventories of aluminum rose from 1290 tonnes in 2008, to 2200 tonnes in 2009, to 2230 tonnes in 2010, to 2360 tonnes in 2011, ultimately decreasing to 2300 in 2012. (Agfa Compl. ¶ 51; Mag Compl. ¶ 50.)

Effective April 1, 2012, the LME adopted a rule agreeing to change the minimum load-out requirement for LME warehouses in the greater Detroit area to 3000 tons per day. (Comm. Compl. ¶ 88; Cons. Compl. ¶ 60; FLP Compl. ¶ 199; <u>see also</u> Agfa Compl. ¶ 67; Mag Comp. ¶ 66.) A company named Rusal objected to and

---

[21] Notably, the FLPs do not allege how the LME's retention of Europe Economics was transformed into the "defendants'" paid consultant, rather than merely that of the LME specifically. (<u>Compare</u> FLP Compl. ¶ 193, <u>with</u> FLP Compl. ¶ 198.) Presumably this allegation is based on the assumption that by virtue of their combined minority ownership interest in the LME's parent, defendants could both control the consultant such that it was "theirs" and exert sufficient influence to determine whether its recommendations would or would not be adopted. However, such an assumption is without support in any allegation.

challenged this change; a U.K. court has stayed its implementation.  R v. London Metal Exch. ex parte United Co. Rusal PLC, [2014] EWHC (Admin) 890 (Eng.).[22]

In November 2012, the European Union announced that it was investigating the LME's warehousing arrangements.  (Comm. Compl ¶ 159; Cons. Compl. ¶ 127; FLP Compl. ¶ 240.)  In 2013, the U.S. Senate Banking, Housing and Urban Affairs Committee began an investigation into the warehousing queues.  (Comm. Compl. ¶ 163; FLP Compl. ¶ 251; see also Cons. Compl. ¶ 114.)

In August 2013, the U.S. Commodity Futures Trading Commission sent subpoenas to Goldman Sachs, JP Morgan, Glencore, PMUSA, and "perhaps others" as part of an inquiry into metals prices.  (FLP Compl. ¶ 271; see also Agfa Compl. ¶ 99; Comm. Compl. ¶ 161; Cons. Compl. ¶ 129; Mag Compl. ¶ 98.)  The Department of Justice also launched a preliminary investigation that same month.  (Cons. Compl. ¶ 129; FLP Compl. ¶ 272; see also Agfa Compl. ¶¶ 2, 99; Comm. Compl. ¶ 162; Mag. Compl. ¶¶ 2, 98.)

The amount of stored aluminum inventory in the Detroit-area LME warehouses continued to increase between 2012 and 2014.  (FLP Compl. ¶ 206.)  By 2013, queues in the Detroit-area LME warehouses had grown to 469 calendar days.  (Comm. Compl. ¶ 90; Cons. Compl. ¶ 145; FLP Compl. ¶ 248.)  As the economic recovery progressed, however, aluminum supplies in non-Detroit-area warehouses

---

[22] The FLPs also allege the LME agreed with Goldman Sachs to increase storage rates.  (FLP Compl. ¶ 203.)  The LME's public documents indicate that storage rates are set by the warehouses themselves and reported to the LME.  See London Metal Exch., Terms and Conditions Applicable to All LME Listed Warehouse Companies § 5.1.4 (2013), available at http://www.lme.com/ ~/media/Files/Warehousing/Warehouse%20consultation/Warehousing%20Agreement.pdf.  While on these 12(b)(6) motions the Court does not find facts but construes allegations in plaintiffs' favor, allegations directly contradicted by the public record impact plausibility.

declined substantially.  (Comm. Compl. ¶ 98; Cons. Compl. ¶ 5(d); FLP Compl. ¶ 207.)

>    2.    Monopoly allegations.[23]

Plaintiffs allege that Goldman has a monopoly over "LME-approved warehousing space for deliveries on LME aluminum and other metals contracts in LME Detroit Warehousing."  (Comm. Compl. ¶ 191; FLP Compl. ¶ 287.)  During the Class Period, Goldman is alleged to have purchased warehouses with more than 80% of the storage space in the Detroit area.[24]  (Comm. Compl. ¶ 191; Cons. Compl. ¶ 85; FLP Compl. ¶ 289.)  Goldman is alleged to have stores of over 50% of the aluminum stored in warehouses located in those parts of the United States that transact based on the Midwest Premium or Platts MW Premium.  (Comm. Compl. ¶ 191; Cons. Compl. ¶ 158; FLP Compl. ¶ 290.)  Together, Goldman and Glencore are alleged to have monopoly power to set prices, to set storage rates, and to control output in their LME warehouses.  (FLP Compl. ¶ 291.)

The FLPs and Commercial End Users allege that LME warehousing in the greater Detroit area is an essential facility, because access to aluminum stored in warehouses in that area is crucial for plaintiffs and class members to be able to successfully conduct business in the United States.  (FLP Compl. ¶ 303; see also Comm. Compl. ¶ 12.)

---

[23] Mag and Agfa do not allege a monopoly claim.

[24] The Class Period is alleged to commence in 2009, but affiliates of Goldman Sachs are not alleged to have purchased Metro International and its warehouses until February 2010.  It is therefore unclear whether the allegations at paragraph 289 in the FLPs' complaint refer to LME warehouses in the greater Detroit area or other warehouses that Goldman acquired, as to which there are no specific allegations in the complaint.

Those plaintiffs who allege a "relevant market" (or several alternative "relevant markets") for their antitrust claims[25] define them as follows:

(1) The market for providing exchange-traded aluminum forward or futures contracts, including to LME warehouses in the United States (Comm. Compl. ¶ 197(b); FLP Compl. ¶ 306);

(2) The market for providing exchange-traded aluminum forward or futures contracts in the United States, including the approval and regulation of warehouses to store the exchange-traded aluminum (Cons. Compl. ¶ 158);

(3) The market for warehouse storage of aluminum in the United States in LME warehouses (FLP Compl. ¶ 306; see Comm. Compl. ¶ 197(a));

(4) The market for warehouse storage of aluminum in areas in which purchase and sale contracts for aluminum are based on the Midwest Premium (FLP Compl. ¶ 306);

(5) The market for warehouse storage of aluminum in the United States and other areas in which aluminum is purchased and sold based on the Midwest Premium (Comm. Compl. ¶ 198);

(6) The market for warehousing LME aluminum in the greater Detroit area (FLP Compl. ¶ 307);

(7) The market for warehousing aluminum in the greater Detroit area (FLP Compl. ¶ 307);

---

[25] Agfa and Mag do not explicitly allege a relevant market. (See Agfa Compl.; Mag Compl.)

(8) The market for warehousing aluminum in the United States (see Comm. Compl. ¶ 198(b));

(9) The market for warehousing aluminum in the contiguous area of Michigan, Ohio, Indiana, Illinois, Wisconsin, Minnesota, and other areas in which aluminum is purchased or sold based on the Midwest Premium (FLP Compl. ¶ 307);

(10) The market in the Detroit area in which aluminum is bought and sold based on the Midwest Premium for storage in or delivery from warehouses (Cons. Compl. ¶ 158);

(11) The market in the United States in which aluminum is bought and sold based on the Midwest Premium for storage in or delivery from warehouses (Cons. Compl. ¶ 158);

(12) The market in the United States in which aluminum is purchased by manufacturers of aluminum consumer products at prices based on, related to, or influenced by the Midwest Premium (Cons. Compl. ¶ 158);

(13) The market in the United States for the sale of aluminum consumer products to consumers for end-use and not for resale and all relevant sub-markets (Cons. Compl. ¶ 158);

(14) The market for aluminum in the United States. (Comm. Compl. ¶ 198(a).)

All told, individually or collectively, plaintiffs allege fourteen potential markets. None are accompanied by allegations regarding product interchangeability, elasticities, or geographic boundaries.

## II.    LEGAL STANDARD ON MOTION TO DISMISS

To survive a Rule 12(b)(6) motion to dismiss, the factual allegations in a complaint must raise plaintiffs' right to relief above the speculative level. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In other words, a complaint must allege enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. In applying that standard, a court accepts as true all well-pleaded factual allegations, but does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." Id. Similarly, a court need not accept "legal conclusions couched as factual allegations." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Port Dock, 507 F.3d at 121).

If the Court can infer no more than "the mere possibility of misconduct" from the factual averments—that is, if the well-pleaded allegations of the complaint have not "nudged [plaintiffs'] claims . . . across the line from conceivable to plausible"— dismissal is appropriate. Iqbal, 556 U.S. at 679-80 (quoting Twombly, 550 U.S. at 570).

The "plausibility" requirement should not, however, be misunderstood as a "probability" standard. Twombly, 550 U.S. at 556; Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 184 (2d Cir. 2012). "Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible." Anderson News, 680 F.3d at 184. On a Rule 12(b)(6) motion, the Court may not choose between two plausible inferences that may both be drawn from the factual allegations. Id. at 185. This is so even if a court finds one of the two versions more plausible. Id.

III.    ANTITRUST STANDING[26]

In an antitrust case, a plaintiff must have constitutional standing under Article III, as well as antitrust standing. See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 535 n.31 (1983); see also Port Dock, 507 F.3d at 121. A plaintiff has Article III standing only if they have suffered an injury in fact. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) ("The irreducible constitutional minimum of standing [requires] . . . injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical . . . ." (citations and quotations omitted)). Plaintiffs' Article III standing is not in dispute. Defendants vigorously contest that plaintiffs have or could plead antitrust standing.

---

[26] Neither § 1 nor § 2 of the Sherman Act provides for a private right of action. That is accomplished by § 4 and § 16 of the Clayton Act. Section 4 provides for a treble damages action and states that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may sue for treble damages. 15 U.S.C. § 15. Section 16 provides for an action for injunctive relief and states that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . ." 15 U.S.C. § 26.

Antitrust standing is "a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement [the court] must dismiss it as a matter of law." Gatt Commc'ns Inc. v. PMC Assocs. L.L.C., 711 F.3d 68, 75 (2d Cir. 2013) (quoting NicSand, Inc. v. 3M Co., 507 F.3d 442, 450 (6th Cir. 2007) (en banc)); see also Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc., 467 F.3d 283, 290-95 (2d Cir. 2006) (dismissing a complaint under Rule 12(b)(6) for lack of antitrust standing).

Establishing antitrust standing requires more than alleging an injury causally related to unlawful conduct. A plaintiff must allege plausible facts that he suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). Thus, although causally related to an antitrust violation, injury does not constitute "antitrust injury" unless it is attributable to an anticompetitive aspect of the challenged conduct. Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990). This requirement is derived from the principle that the antitrust laws were enacted for "the protection of competition, not competitors." Brown Shoe Co. v. United States, 370 U.S. 294, 319 (1962); see also Gatt, 711 F.3d at 75 ("Absent such boundaries, the potent private enforcement tool that is an action for treble damages could be invoked without service to—and potentially in disservice of—the purpose of the antitrust laws: to protect competition.").

The Supreme Court decided two cases in back-to-back terms addressing antitrust standing in the context of private damages actions: <u>Blue Shield of Virginia v. McCready</u>, 457 U.S. 465 (1982), and <u>Associated General Contractors of California, Inc. v. California State Council of Carpenters</u> ("<u>AGC</u>"), 459 U.S. 519 (1983).

<u>McCready</u> was a 5-4 decision in which Chief Justice Burger and Justices Rehnquist, O'Connor, and Stevens dissented. There, the Court held that while plaintiff was not a competitor of the alleged conspirators, "the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict." 457 U.S. at 484. In that case, plaintiff McCready alleged that her health insurer Blue Shield of Virginia and an organization of psychiatrists conspired to exclude psychologists from eligibility for compensation under Blue Shield's insurance plans. <u>Id.</u> at 469-70. McCready sought reimbursement from Blue Shield for treatment by a psychologist. <u>Id.</u> at 467-69. However, Blue Shield only allowed her and other subscribers to choose between "visiting a psychologist and forfeiting reimbursement, or receiving reimbursement by forgoing treatment of a provider of their choice." <u>Id.</u> at 483. The Court found that McCready's injury "flow[ed] from that which makes defendants' acts unlawful" under the antitrust laws, and accordingly there was no persuasive rationale to deny McCready redress. <u>Id.</u> at 484-85.

In <u>AGC</u>, an 8 to 1 decision in which Justice Marshall was the lone dissenter, the Court set forth a framework for defining the boundaries of antitrust standing. There, a union sought redress on behalf of its membership for alleged antitrust violations. 459 U.S. at 520. In tension with the broad language of <u>McCready</u>, the

Court found that the union lacked antitrust standing. <u>Id.</u> at 545-36. In doing so, the Court identified several factors court should consider in determining whether a plaintiff has antitrust standing: (1) the causal connection between the violation and the harm; (2) the presence of an improper motive; (3) the type of injury and whether it was one Congress sought to address; (4) the directness of the injury, (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex damage apportionment. <u>Id.</u> at 537-44. Applying these factors, the Court concluded: (1) the causal chain consisted of several "somewhat vaguely defined" links; (2) motive was not a significant issue in the case; (3) the type of injury was not one Congress sought to address because the union was "neither a consumer nor a competitor in the market in which trade was restrained"; (4) the union's alleged injury was too indirect; (4)-(5) the injury was speculative because the effects of the conspiracy were indirect and could have been caused by independent factors; and (6) there was an alternative class of plaintiffs better situated to pursue the claims, which created a risk of duplicative damages. <u>Id.</u> at 539-45 & n.37.

The Second Circuit has "distilled" the <u>AGC</u> factors "into two imperatives": first, that a plaintiff plausibly allege that he suffered antitrust injury, and, second, that he plausibly allege facts that support his suitability as a plaintiff to pursue the alleged antitrust violation—and that he would therefore be an "efficient enforcer" of the antitrust laws. <u>Gatt</u>, 711 F.3d at 76; <u>see also</u> <u>Port Dock</u>, 507 F.3d at 121; <u>Daniel v. Am. Bd. of Emergency Med.</u>, 428 F.3d 408, 443 (2d Cir. 2005).

The Second Circuit employs a three-step process for determining whether a plaintiff has plausibly alleged antitrust injury.  Gatt, 711 F.3d at 76.  The plaintiff must first identify the practice complained of and the reasons why such practice is or might be anticompetitive.  Id.  Next, a court must identify the actual injury that plaintiff alleges and inquire how plaintiff is in a worse position as a consequence of the conduct.  Id.  Finally, a court must compare the "anticompetitive effect of the practice at issue" to the "actual injury the plaintiff alleges."  Id. (quoting Port Dock, 507 F.3d at 122).  This multi-step inquiry assures that a causal link is not the sole basis for determining there has been an "antitrust injury."

Whether a plaintiff would be an "efficient enforcer" depends on a balancing of the following factors:

> (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

Gatt, 711 F.3d at 76 (quoting Paycom, 467 F.3d at 290-91); see also Port Dock, 507 F.3d at 121; Daniel, 428 F.3d at 443.

Neither AGC nor McCready addressed the extent to which their holdings apply in actions where plaintiffs do not seek damages, but rather only seek injunctive relief.  Two of the actions here, brought by the Consumer End Users and Commercial End Users, seek only injunctive relief with regard to their federal

antitrust claims.[27]   However, in neither <u>AGC</u> nor <u>McCready</u> did the Court indicate that its holding or rationale is limited to actions for monetary damages.

The <u>AGC</u> factors relating to complex, speculative and/or duplicative damages beg the question of whether and how that analysis changes in the context of actions in which only injunctive relief is sought.  However, the principles behind those factors drive this Court's analysis.  In this regard, issues with complex and speculative damages concern the fact and nature of harm (that is, damage) as much as a calculation of dollars and cents.  Is determining the fact of damage complex?  Does remedying plaintiff's injury through injunctive relief present complex issues?

Similarly, to assess the potential for duplicative recovery, the Court must reasonably ask not only whether there is another plaintiff who will recover a quantum that would account for monetary damage, but also whether the relief one plaintiff seeks more generally (such as injunctive relief), is being adequately pursued by another, better-situated party.  Thus, the <u>AGC</u> factors are reasonably applicable to actions in which only injunctive relief is sought.  Finally, in all cases the court is cautioned to be mindful the manageability of litigation.  That is, allowing actions to proceed in which plaintiffs seek overlapping relief and in which their presence provides no additional benefit may well add to manageability issues. <u>Cf.</u> <u>Sacramento Valley, Chapter of the Nat'l Elec. Contractors Ass'n v. Int'l Bhd. of Elec. Workers</u>, 888 F.2d 604, 608-09 (9th Cir. 1989).

---

[27] These plaintiffs seek damages for state law competition and other claims.

A.    Role in the Market

In most antitrust cases, the applicability of the AGC factors is relatively straightforward because private plaintiffs are typically either competitors or consumers in the relevant market.  As McCready demonstrates, however, this is not invariably or even necessarily the case.  457 U.S. at 483-84 (plaintiff was customer, not competitor, of defendant); see also Crimpers, 724 F.2d at 294 (plaintiff was trade show organizer, not participant in market for cable programming); Province v. Cleveland Press Publ'g Co., 787 F.2d 1047, 1052 (6th Cir. 1986) (plaintiffs were former employees, not competitors, of defendants).  In the absence of a market role as a competitor or consumer, a plaintiff may also show that his injury is "inextricably intertwined" with the injury inflicted on the relevant market. McCready, 457 U.S. at 484; Province, 787 F.2d at 1052.  "To be inextricably intertwined with the injury to competition, the plaintiffs must have been 'manipulated or utilized by [d]efendant as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographical market.'"  Province, 787 F.2d at 1052 (quoting Southaven Land Co. v. Malone & Hyde, Inc., 715 F.2d 1079, 1086 (6th Cir. 1983)) (finding plaintiffs' injury was not inextricably intertwined because their injury was "a result of—rather than a means or the cause of—the harm").  In all cases in which the court found standing on this basis, either defendants alleged a relevant market, or neither party raised the issue. This Court is unaware of any case in which plaintiffs were neither competitors nor

consumers and failed to allege a defined market yet were found to have antitrust standing.

The parties here have focused on the facts and language of certain cases with regard to the antitrust standing analysis. In particular and in addition to those decisions already discussed, the parties have extensively briefed the following decisions: Crimpers Promotions Inc. v. Home Box Office, Inc., 724 F.2d 290 (2d Cir. 1983) (Friendly, J.); Reading Industries, Inc. v. Kennecott Copper Corp., 631 F.2d 10 (2d Cir. 1980); Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc., 253 F. Supp. 2d 262 (D. Conn. 2003); and Loeb Industries, Inc. v. Sumitomo Corp.

In Crimpers, which was decided shortly after the Supreme Court handed down its decision in AGC, the Second Circuit held that a company organized to hold a television trade show had antitrust standing to assert a claim under § 4 of the Clayton Act against HBO and Showtime. These entities were alleged to have orchestrated a successful boycott of the trade show to further cement their dominance in the market for cable programming. 724 F.2d at 290. Plaintiff Crimpers was a company organized to hold a television trade show in Las Vegas that sought to bring together cable television programmers; Crimpers was not itself a cable programmer, nor did it otherwise participate directly in the market for cable programming. See id. at 291. Relying on McCready, the Court determined that plaintiff had antitrust standing because the defendants' scheme would not have been profitable had it not directly used plaintiff, and thus plaintiff's injury was "inextricably intertwined with the injury the defendants sough to inflict on

40

producers and television stations in the cable television programming market." Id. at 294-95. Then, after assessing each of the AGC factors, the Court concluded that plaintiffs had adequately established antitrust standing. See id. at 296-97.

Finally, Loeb represents the Seventh Circuit's interpretation of where to draw the lines set forth in AGC and McCready. There, copper purchasers at different levels of the supply/distribution chain sued Sumitomo, alleging it had conspired to fix the price of copper futures at artificially high levels on the LME and Comex exchanges. 306 F.3d at 474. Copper prices were directly linked to the LME and Comex prices for copper futures, and various forms of physical copper were quoted using formulas relating to these prices. Id. at 476. The Seventh Circuit found that copper scrap dealers ("Scrap Dealers") lacked antitrust standing but that others (namely, Viacom, Inc. and Emerson Electric Co.) who turn copper cathode into wire for resale, were not too remote from the allegedly anticompetitive conduct, and thus had antitrust standing. Id. at 475, 484-86, 492.

According to the Seventh Circuit, even if the Scrap Dealers could establish that their injuries flowed directly from defendants' alleged market manipulations, that injury was nevertheless indirect. Id. at 484. The Scrap Dealers were several layers down the supply/distribution chain—after an integrated producer who refined the copper and a manufacturer who turned the refined copper into a product, possibly generating scrap in the process. Id. at 484-85. The Court noted that under AGC, the directness inquiry focuses on the presence of more immediate victims of the antitrust violation who are better positioned to maintain an action.

Id. at 484.  The Court identified several other groups of entities in such a better position, including traders who had already filed and settled claims with defendants.  Id. at 484-85.  In addition, the Court found that the Scrap Dealers' damages were speculative.  Id. at 485.  Finally, the Court noted that the Scrap Dealers' claim presented a real risk of duplicative recovery and complex damage apportionment, as physical copper could be sold and resold many times.  Id. at 485-86.  The Court resolved this issue by restricting the right to recover to those more directly affected by defendants' actions.  Id.

In contrast to the Scrap Dealers, however, the Court found that Viacom, which purchased copper directly based on inflated Comex prices, was directly injured.  Id. at 489.  Despite the defendants' argument to the contrary, the Court found that Viacom's injury "d[id] not depend on the speculative actions of innumerable market decision makers," but "flowed instead directly from the contracts between Viacom and its suppliers."  Id. at 488-489.  The Court also found that damage apportionments at this level of the supply/distribution chain could be easily resolved with basic market and purchasing data.  See Id. at 490-91.

In Reading, the Second Circuit held that a copper scrap refiner did not have antitrust standing to assert a claim of a price-fixing conspiracy because plaintiff's theory of injury "depend[ed] upon a complicated series of market interactions" between the refined copper market, in which the defendants acted, and the copper scrap market, where plaintiff was allegedly injured.  631 F.2d at 13.  Plaintiff's "attenuated economic causality" and the possibility that other market variables

intervened to affect the prices plaintiff paid for copper scrap weighed against finding that plaintiff had antitrust standing.  See id. at 14.

In Ice Cream, the District of Connecticut concluded that an ice cream company had antitrust standing to sue dairy cooperatives that allegedly conspired to fix the prices of milk, cream, and butter.  254 F. Supp. 2d at 266-67.  There, the allegedly anticompetitive conduct took place in the market for butter on the Chicago Mercantile Exchange ("CME"), not the physical markets for butter, cream, or milk. Id. at 268-69.  However, because plaintiffs alleged that the prices in the physical market were closely tied to those in the CME butter market, the link between the conduct and plaintiffs' alleged injuries was sufficiently direct.  See id. at 273-74.  Of note, defendants in Ice Cream both traded in the CME butter market and directly sold dairy products to defendants in the physical market.  See id. at 268-70.

Taken together, these cases demonstrate that the determination of whether a plaintiff has antitrust standing is based on a careful examination of the specific factual allegations in the complaints at issue.  The court must first determine the type of injury alleged, and then examine plaintiff's proximity and relationship to that injury.

B.    Discussion of Plaintiffs' Antitrust Standing

There are 6 coordinated cases with 13 motions to dismiss pending before this Court.  Defendants assert that none of the plaintiff groups could possibly allege sufficient plausible facts to support antitrust standing.  This Court has considered the sufficiency of each complaint individually, according to its allegations.

43

As set forth above, the Court's initial evaluation of standing relates to whether plaintiffs have adequately alleged antitrust injury. Here, plaintiffs uniformly allege that by paying a price for aluminum which incorporated an inflated Midwest Premium, they have alleged classic antitrust injury. This argument has an obvious, immediate appeal: coordinated action that inflates price is a classic form of antitrust injury. Of course, this most frequently occurs in the context of direct competitors or consumers of the defendants, and therefore whose participation in a relevant market is plain. Not so here. Here, plaintiffs proceed along the "inextricably intertwined" theory—a la McCready, Crimpers and the other cases discussed above. That framework necessarily requires understanding the market in which the actual antitrust injury is alleged to have occurred and to whom; this, of course, requires some clear reference to a product market and the competitors within that market. This is not a requirement for the specificity of market allegations necessary for a § 2 claim (described below), but rather is a recognition that one cannot determine that which constitutes "antitrust" injury in the absence of knowing the type of competitive process alleged to have been interfered with. This flows from the fundamental principle that the antitrust laws were designed to protect "competition, not competitors." Brown Shoe, 370 U.S. at 319.

By failing clearly or adequately allege a market in which antitrust injury is experienced and by whom, plaintiffs fail to support their own antitrust injury. That they were harmed by paying higher prices they have alleged—and they have done

so clearly. But how that impacted competition and in which market is not. None of the complaints clearly refers to a market where antitrust injury is directly experienced or how. To support a <u>McCready-</u> or <u>Crimpers</u>-type analysis, plaintiffs must allege where the antitrust injury is experienced, the impact it has on the competitive process, to whom, and how their injury is "inextricably intertwined."

This threshold issue is, perhaps, a problem of choosing one among several horses (<u>i.e.</u>, markets) to ride. Plaintiffs may, of course, choose to ride a number of horses—but they must specify precisely what each horse looks like and what is involved in riding each. Without such clarity, this Court cannot determine whether plaintiffs' injury is "inextricably intertwined" with anticompetitive injury.

For this analysis the Court asks, were plaintiffs manipulated or utilized by the defendants as a "fulcrum, conduit or market force" to injure competitors or participants in the relevant product or geographic market? <u>Province</u>, 787 F.2d at 1052 (quotation omitted). Are plaintiffs here situated as in <u>McCready</u>, where plaintiff was a consumer of services from an individual psychologist that defendants sought to exclude? <u>See</u> 457 U.S. at 368. Or as in <u>Crimpers</u>, where plaintiff was a trade show that sought to bring together producers and television stations in the cable television programming market? 724 F.2d at 294-95. Here, the markets are unclear and frankly confused: if the relevant market is LME warehouse services in the Detroit area, was the anticompetitive conduct aimed at causing storage fees to rise? Who was targeted and who therefore suffered the initial injury—the warrant holders or parties to aluminum futures contracts? Or, is the relevant market the

LME futures and forward contracts market?  If so, was the anticompetitive conduct to raise the price of aluminum to the detriment of other traders in those instruments?  In order for plaintiffs to proceed on an "inextricably intertwined" theory, they must allege with clarity what the relevant market is, what precise anticompetitive conduct occurred <u>in that market</u>, and how their injury was inextricably intertwined with <u>that</u> injury.  In the absence of such allegations, plaintiffs have failed to adequately allege that they have antitrust standing.

Plaintiffs' allegations regarding the market structure in which defendants' challenged conduct occurred highlights the particular complexities of the antitrust injury question here.  According to plaintiffs, the vast majority of aluminum trading activity on the LME takes place among banks, hedge funds and traders, rather than users of aluminum.  A contango—which exists when the forward price of aluminum is higher than the current price—provides these traders with an arbitrage opportunity.  Such arbitrage definitionally requires traders to retain warrants for some period of time.  Because futures trading is a zero-sum game (as each "dollar gained by a long trader is lost by a short trader on the other side of the contract," <u>de Atucha v. Commodity Exch., Inc.</u>, 608 F.Supp. 510, 516 (S.D.N.Y. 1985)), defendants could not have completed their scheme unless another trader purchased an offsetting position.  As cast in the complaints, this scheme therefore required traders on different sides of the futures contract making opposing bets, with one losing.  This scheme does not directly require any participation by plaintiffs.[28]  But

_____

[28] This case is unlike others in which plaintiffs who are neither competitors nor consumers have been found to have standing.  In each of those cases, plaintiffs were necessary to the completion of the

46

it may be that plaintiffs are indirectly necessary. For instance, it may be that the price of aluminum futures contracts is necessarily impacted by the actual expected usage of aluminum by manufacturers. That is, without usage of aluminum and therefore without purchases of aluminum at some point along the chain, the traders would not have a market opportunity. The factual allegations of the current complaints are, however, insufficient to support such a view.

For these reasons, plaintiffs have failed adequately to support allegations of antitrust injury.

A. Are Plaintiffs Efficient Enforcers?

Even if plaintiffs can adequately allege antitrust injury, as currently pled their claims nonetheless fail: they have a separate obligation to support their role as efficient enforcers of the antitrust laws with specific allegations. Gatt, 711 F.3d at 76; Port Dock, 507 F.3d at 121. They have failed to do so. Each complaint contains its own set of allegations regarding the role of the plaintiffs therein in the supply/distribution chain. The Court has reviewed each of the complaints against their respective and individualized allegations. Nevertheless, the complaints share certain deficiencies.

All allegations refer to roles which are more than one level down in the supply/distribution chain.[29] None of the complaints alleges that plaintiffs in fact

---

scheme. See, e.g., McCready, 457 U.S. at 479 (only if insureds such as McCready ceased using psychologists would the scheme achieve its purpose); Ice Cream, 253 F. Supp. 2d at 269-70 (plaintiffs needed to buy milk and cream from defendants at inflated prices for scheme to work effectively).

[29] Mag and Agfa allege that they purchased some aluminum directly from producers (Alcoa and Hyrdo); but it is unclear to what extent that would have incorporated the Midwest Premium, and the extent to which those purchases were in the U.S. or elsewhere, or whether that matters.

themselves purchase any aluminum directly out of the LME-approved warehouses. Instead, all plaintiffs are one or more levels down the supply/distribution chain from such purchases.[30] The Commercial End Users' and Consumer End Users' aluminum purchases are the furthest down the chain and definitionally indirect. As they allege, their purchases incorporating the inflated Midwest Premium occurred several layers down the supply/distribution chain. For instance, the Commercial End Users include several boat manufacturers, such as SeaArk Boats and F & F, who do not allege that they purchased the aluminum directly from a warehouse, or even directly from an entity that did. Indeed, they characterize themselves as "<u>End</u> Users." Similarly, the Consumer End Users—including individual consumers and a pizzeria—may simply have bought canned soft drinks or other consumer products incorporating the inflated Midwest Premium. Well before any of these purchases, the aluminum had been purchased, delivered from a warehouse to some initial buyer, and then another buyer and so on, down the supply/distribution chain, with each step potentially involving additional fabrication or services.

The injury suffered by these plaintiffs is therefore indirect. Their injury is paying a price for a product partially made from aluminum that partially incorporates the Midwest Premium. While these plaintiffs are not seeking monetary damages for their antitrust claims, the question of whether they are

---

[30] Of the FLP plaintiffs, only two, International Extrusions and Talan, specifically assert that they in fact purchased and took delivery of aluminum that was formerly warranted in an LME warehouse. (See FLP Compl. ¶¶ 105-15.) But it is unclear as to whether this aluminum was warranted in LME warehouses in Detroit or elsewhere, and these plaintiffs do not allege that they purchased it directly from an LME warehouse.

efficient enforcers as to those claims remains. In this regard, the type of relief requested is only one factor; the questions of how to assess their injury and how to determine causation are others. Given their own allegations regarding their position in the supply/distribution chain, isolating their particular damage from other potential causal factors would present a highly complex task. For instance, did labor costs, transportation costs or bottling costs lead to an increase in prices? These issues do not simply disappear because these plaintiffs are not seeking a monetary recovery.

In terms of injunctive relief (and putting to one side for the moment the question of the adequacy of allegations for obtaining injunctive relief), all plaintiffs would presumably seek similar injunctive terms. But upstream plaintiffs would be more closely positioned to industry dynamics and therefore arrive at relief that might better address any unlawful conduct, and in the process, prevent harm from flowing downstream. Thus, the Commercial End Users and Consumer End Users are pursuing duplicative relief, even if in the form of an injunction. Their roles as plaintiffs thus compounds manageability issues without providing any clear benefit.

There are numerous other plaintiffs further up the supply/distribution chain (as demonstrated in the remaining complaints) who would be better positioned to enforce the antitrust laws. As a result, Supreme Court precedent dictates that these plaintiffs do not have antitrust standing to maintain an action under § 4 of

the Clayton Act. [31]  Given their own allegations regarding their positions in the supply/distribution chain, they cannot plead around this issue.

The FLPs, Mag, and Agfa plaintiffs are, however, situated further up the supply/distribution chain.  Nevertheless, based on deficiencies in their allegations, the Court is led to a similar result.  In short, none of these plaintiffs have set forth sufficient allegations regarding from which level in the supply/distribution chain they purchased aluminum in order to be able assess their role vis-à-vis other potential plaintiffs.  The Court understands from the allegations that plaintiffs do not purchase aluminum from the LME warehouses directly, but it is unable to ascertain how far down the chain their purchases occur.

For instance, Mag and Agfa both allege direct purchases from integrated producers such as Alcoa and Hydro, but they do not allege whether they made such purchases before or after any LME warehousing (or, whether the prices they paid for aluminum were dependent on the Midwest Premium).  They allege that they manufacture products (such as flashlights and lithographic printing plates) that use aluminum.  However, there are insufficient facts from which this Court can determine whether the aluminum purchased by these plaintiffs has been fabricated by one or more companies before these purchases have been made.  The number of steps in their supply/distribution chains plainly implicate the directness of their injury, and whether any damages might be duplicative.  Moreover, the Court cannot

---

[31] While these plaintiffs do not assert claims for damages under the federal antitrust laws, and instead assert only a claim for injunctive relief, plaintiffs must also demonstrate antitrust standing to assert such a claim.  Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 484, 491 (1986) (applying antitrust standing requirement to claims for injunctive relief); Daniel, 428 F.3d at 437; Paycom, 467 F.3d at 290.

adequately analyze whether damages would be speculative without additional, specific allegations.

The FLPs present similar issues.[32]  While they have characterized themselves as "first level" purchasers, it is not clear from whom they buy aluminum, what form they buy it in, or exactly how they use it once it is bought.  In this regard, the Court notes that some of these plaintiffs may have purchased aluminum from others who themselves purchased the aluminum from a trader or broker.  Thus, while their complaint certainly alleges that they purchase aluminum, it is not clear from the complaint whether they are truly "first level" purchasers.  It may be that they are one or more levels below a true first level.  As with Mag and Agfa the answers to these questions are necessary to any assessment of the directness of their injury, the speculative nature of their damages, the danger of duplicative recovery, or whether they would be efficient enforcers.  Supreme Court and Second Circuit precedent requires additional specificity to support the FLPs' standing under the federal antitrust laws.

In sum, as pled, the complaints of Mag, Agfa and the FLPs do not support antitrust standing.  The allegations instead present a complex market structure with many participants who are not necessarily involved in this lawsuit.  In such a complicated structure, to perform an <u>AGC</u> analysis, the identity and role of market

---

[32] To the extent that the FLPs purchase aluminum from traders or others who were themselves paying higher than reasonable storage fees; it may be that those traders would not be incented to pursue claims.  Traders may stand to gain more from the arbitrage opportunity than they lose in increased storage costs.  Econometric modelling could presumably predict when the arbitrage opportunity would exceed expected costs.  In this scenario, the FLPs could potentially be the most efficient enforcers.  However, to support this scenario, plaintiffs would need additional allegations relating to trading dynamics, etc.

participants must be set forth in the pleadings.  A less complicated market structure would present fewer complex issues.

IV.    SECTION 1 CONSPIRACY

All plaintiffs here have alleged violations of Section 1 of the Sherman Act. That is, they have alleged that defendants engaged in a conspiracy to restrain trade.

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade . . . ."  15 U.S.C. § 1.  While this language casts a wide net, case law has established that only "unreasonable" restraints of trade are unlawful.  Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723 (1988); see also In re Publ'n Paper Antitrust Litig., 690 F.3d 51, 61 (2d Cir. 2012).  A unilateral or independent business decision that results in a restraint of trade is not a violation of § 1.  Copperweld Corp. v. Ind. Tube Corp., 467 U.S. 752, 775 (1984).  To run afoul of § 1, the unreasonable restraint must result from agreement between two or more entities.  See Twombly, 550 U.S. at 553-54; Theatre Enters., Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 540 (1954); Anderson News, 680 F.3d at 182. Accordingly, plaintiffs must plausibly allege that two or more defendants conspired to unreasonably restrain trade.  It is not enough that trade was impacted by unilateral business decisions.

In analyzing restraints of trade, courts have typically examined the participants' respective market roles: are they competitors, or are they in a supplier/distributor relationship?  Market roles may be suggestive of whether

coordinated conduct is designed to interfere with the competitive process or when competitors have dispensed with normal independent decision making.

In this regard, agreements that fall within the scope of § 1 are descriptive of such roles and characterized as either "horizontal" or "vertical." See United States v. Topco Assocs., Inc., 405 U.S. 596, 608 (1972); Anderson News, 680 F.3d at 182. A horizontal agreement is an "agreement between competitors at the same level of the market structure," while a vertical agreement is a "combination[] of persons at different levels of the market structure." Topco, 405 U.S. at 608.

A.    Per Se or Rule of Reason Analysis

Plaintiffs allege that defendants have engaged in per se violations of § 1 of the Sherman Act.   It is unnecessary for a plaintiff to make detailed allegations regarding a relevant market when the violation is "per se" unlawful.   Put bluntly, the pleading burden as to market definition is lower for per se violations of § 1. Courts analyze the legality of restraints under two frameworks: the "per se" rule or the "rule of reason."   State Oil Co. v. Khan, 522 U.S. 3, 10 (1997); see also Paycom, 467 F.3d at 289.[33]   Both the per se rule and the rule of reason are used to assist a court or fact-finder in forming a judgment about the competitive significance of a challenged restraint.   NCAA v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 103 (1984).

---

[33] Plaintiffs argue that it is premature and unnecessary for this Court to resolve whether a rule of reason or per se analysis should be applied in these cases.   That is undoubtedly true.   But resolution of the issue for fact-finding purposes is separate from ensuring that there are sufficient allegations to support the claims themselves.   In this regard, when a rule of reason analysis is potentially (and, here, likely) required, plaintiffs have an obligation to allege a relevant market.   This of course allows the parties to conduct appropriate discovery.

Most antitrust claims are evaluated under the rule of reason.  Paycom, 467 F.3d at 289.  Most vertical agreements and mixed agreements (those with both horizontal and vertical aspects) are analyzed in this manner.  The "rule of reason" is the standard used to assess whether restraints not unlawful per se nonetheless violate § 1 of the Sherman Act.  See Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 885-86 (2007).  A rule of reason analysis requires a court to weigh all of the circumstances surrounding the challenged conduct to determine whether the alleged restraint is unreasonable, taking into account the nature of the specific business, the industry, the restraint's history, and whether the defendant has market power.  Id.; see also Gatt, 711 F.3d at 75 n.8.[34]

The purpose of a rule of reason analysis is to enable a finder of fact to first determine whether a restraint imposes an unreasonable restraint on competition.  State Oil, 522 U.S. at 10; Paycom, 467 F.3d at 290.  As a threshold matter, a plaintiff must allege the plausible existence of a combination that causes an unreasonable restraint of trade.  The burden shifts to defendant to present the procompetitive value of the practice; if defendant carries that burden, then the burden shifts back to plaintiff, who must show that the same procompetitive effect could have been achieved by less restrictive means.  Virgin Atl. Airways Ltd., v. British Airways PLC, 257 F.3d 256, 264 (2d Cir. 2001).  Under a rule of reason

---

[34] "In this Circuit, a threshold showing of market share is not a prerequisite for bringing a § 1 claim." Todd v. Exxon Corp., 275 F.3d 191, 206 (2d Cir. 2001); K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co., 61 F.3d 123, 129 (2d Cir. 1995) ("If a plaintiff can show an actual adverse effect on competition, such as reduced output . . . we do not require a further showing of market power.").

analysis, plaintiff can only recover if the challenged conduct reduced competition, thereby harming consumers. Id.

In contrast to the typical analysis of vertical, and mixed horizontal and vertical agreements, horizontal agreements between competitors are considered the most potentially pernicious and are generally treated as "per se" unlawful. See, e.g., Topco, 405 U.S. at 608, 611 (noting that horizontal agreements to engage in price fixing or market allocation are per se illegal under § 1 of the Sherman Act). The per se rule is a presumption of unreasonableness based on "'business certainty and litigation efficiency.'" Atl. Richfield, 495 U.S. at 342 (quoting Arizona v. Maricopa Cnty. Med. Soc'y, 457 U.S. 332, 344 (1982)). "It represents a 'longstanding judgment that the prohibited practices by their nature have a substantial potential for impact on competition.'" Id. (quoting FTC v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 433 (1990) (internal quotation marks omitted). Horizontal price fixing—that is, price fixing by competitors in the same market—is per se illegal. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223-24 (1940); Todd, 275 F.3d at 198.

To apply the per se rule, a court generally must have experience with the type of restraint at issue in order to predict with confidence that it would be condemned under the rule of reason; only when such predictability is present should the court apply the per se rule. Maricopa County Med. Soc'y, 457 U.S. at 344. The importance of this requirement cannot be overstated. The point of choosing between a per se or rule of reason framework is, in large part, driven by a desire to

maximize litigation efficiencies and reduce litigation and evidentiary burdens where clearly appropriate. It simply takes less time and fewer resources to analyze antitrust claims under a per se framework. Applying a per se framework is an acknowledgement of a court's familiarity with a type of restraint—such familiarity that it is assumed that no business rationale would counterbalance its anticompetitive nature. The rule of reason applies when a court does not have or should not have such confidence in its assessment of the challenged restraint. The rule of reason is a judicial recognition that businesses change and entire industries transform in unforeseen ways that call for new answers to old questions. As time goes on, the roles of market participants may become fluid, and predictability may consequently diminish. In order not to unduly interfere with the functioning of an efficient market, the natural development of an industry, and healthy competitive processes, courts should apply the per se rule only when truly certain of that it applies to the conduct at hand. Without that certainty, courts risk providing a solution in search of a problem, and might "fix" problems that Congress never intended to be remedied by the federal antitrust laws.

A vertical restraint is not generally illegal per se unless it includes some agreement on price or price levels. <u>Bus. Elecs.</u>, 485 U.S. at 735-36. "Vertical restraints that do not involve price-fixing are generally judged under the 'rule of reason, which requires a weighing of the relevant circumstances of a case to decide whether a restrictive practice constitutes an unreasonable restraint on competition.'" <u>Anderson News</u>, 680 F.3d at 183 (quoting <u>Monsanto Co. v. Spray-Rite</u>

Serv. Corp., 465 U.S. 752, 761 (1984)).  "Any combination which tampers with price

structures is engaged in an unlawful activity."  Socony-Vacuum, 310 U.S. at 221.

Group efforts to raise, lower, or stabilize prices directly interfere with the free play

of market forces and constitute unlawful price fixing.  Id.  "Where the means for

price fixing are purchases or sales of the commodity in a market operation or, as

here, purchases of a part of the supply of the commodity for the purpose of keeping

it from having a depressive effect on the markets, such power may be found to exist

though the combination does not control a substantial part of the commodity."  Id. at

224.

 B. Allegations of Concerted Action

 In order for plaintiffs plausibly to allege coordinated conduct in violation of §

1, they must allege plausible allegations of concerted action.  Allegations merely

consistent with unilateral action are insufficient.  See Twombly, 550 U.S. at 556-57;

Monsanto, 465 U.S. at 761; Copperweld, 467 U.S. at 768; Anderson News, 680 F.3d

at 183.  "[T]here is a basic distinction between concerted and independent action . . .

."  Monsanto, 465 U.S. at 761.  Allegations must support a unity of purpose,

common design and understanding, or a meeting of the minds in an unlawful

agreement.  Cf. Am. Tobacco Co. v. United States, 328 U.S. 781, 810 (1946).

 Plaintiffs need not, however, plead direct evidence of conspiracy.  See

Anderson News, 680 F.3d at 183.  Conspiracies are rarely evidenced by explicit

agreements—they must nearly always be proven through "'inferences that may

fairly be drawn from the behavior of the alleged conspirators.'"  Id. (quoting

Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1043 (2d Cir. 1976); see also Mayor & City Council of Balt. v. Citigroup, Inc., 709 F.3d 129, 136-37 (2d Cir. 2013) (in many antitrust cases, "smoking gun" evidence can be hard to come by, and thus a complaint must set forth sufficient circumstantial facts supporting an inference of conspiracy).

At the pleading stage, plaintiffs here must allege sufficient facts to support (not "prove" or even "demonstrate") a plausible inference that defendants reached an agreement; a complaint merely alleging parallel conduct alone is not sustainable. Twombly, 550 U.S. at 556; see also Mayor & City Council of Balt., 709 F.3d at 135-36 ("[A]lleging parallel conduct alone is insufficient, even at the pleading stage."); Anderson News, 680 F.3d at 184. In cases in which there is obvious parallel conduct and the question is whether it is the product of coordinated or unilateral decision making, a plaintiff must allege additional facts that point toward a meeting of the minds. Twombly, 550 U.S. at 557.

Even conscious parallelism in pricing among competitors is not itself unlawful. Id. at 553-54; In re Publ'n Paper, 690 F.3d at 62. By engaging in conscious parallelism, firms in a concentrated market may lawfully recognize shared economic interests and, in effect, lawfully market power by setting their prices at a profit maximizing, supra-competitive level. Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227-28 (1993). Conscious parallelism alone is consistent with both lawful independent conduct and an unlawful conspiracy; the mere fact of even conscious parallelism is, therefore, insufficient to

establish an antitrust violation.  In re Publ'n Paper, 690 F.3d at 62.  "The

inadequacy of showing parallel conduct or interdependence, without more, mirrors

the ambiguity of the behavior: consistent with conspiracy, but just as much in line

with a wide swath of rational and competitive business strategy unilaterally

prompted by common perceptions of the market."  Twombly, 550 U.S. at 554.

"Plus-factors" may provide the additional circumstances necessary to permit

a fact-finder to infer a conspiracy.  Examples of plus-factors are a common motive to

conspire, actions taken against economic self-interest, and a high level of inter-firm

communications.  In re Publ'n Paper, 690 F.3d at 62; Apex Oil Co. v. DiMauro, 822

F.2d 246, 253-54 (2d Cir. 1987) (suggesting that allegations that are consistent only

with market actors who are aware of and anticipate similar actions by competitors

would be insufficient to support the existence of a tacit agreement).

Twombly is a particularly instructive case.  There, plaintiffs alleged that the

parallel conduct of defendant telecommunications companies evidenced an unlawful

conspiracy.  550 U.S. at 548-51.  The Supreme Court found that defendants' parallel

conduct, even when plainly unfavorable to competition, did not state an antitrust

claim; that is, such conduct, absent some factual context suggesting agreement, as

distinct from identical, independent action, was insufficient to state a claim.  Id. at

548-49.  The Court stated:

> Without more, parallel conduct does not suggest
> conspiracy, and a conclusory allegation of agreement at
> some unidentified point does not supply facts adequate to
> show illegality.  Hence, when allegations of parallel
> conduct are set out in order to make a § 1 claim, they
> must be placed in a context that raises a suggestion of a

preceding agreement, not merely parallel conduct that
could just as well be independent action.

Id. at 556-57.

In Twombly, plaintiffs alleged that the incumbent telephone companies had
engaged in parallel conduct and agreed to refrain from competing against one
another.  Id. at 550.  Plaintiffs argued that such an agreement could be inferred
from defendants' failure meaningfully to pursue "attractive business
opportunit[ies]" in markets where they possessed "substantial competitive
advantages."  Id. at 551 (alteration in original).  In sum, plaintiffs' allegations
amounted to "some illegal agreement may have taken place between unspecified
persons at different [incumbent telephone companies] . . . at some point over seven
years . . . ."  Id. at 560 n.6.  Plaintiffs' pleadings also "mentioned no specific time,
place, or person involved in the alleged conspiracies."  Id. at 565 n.10.

Anderson News presents a contrasting set of allegations.  A magazine
wholesaler sued defendants for a violation of § 1, on the basis that they had
conspired to divide the market and drive it out of business.  680 F.3d at 170-72.
There, plaintiff alleged that ten specific executives engaged in meetings and
communications at specific dates and times to plan an illegal concerted boycott.  Id.
at 187-89.  Plaintiff also alleged that some of the executives made statements that
"may plausibly be interpreted as evincing their agreement to attempt to eliminate
[plaintiffs] as wholesalers in the single-copy magazine market and to divide that
market . . . ."  Id. at 187.  Plaintiff also recited specific telephone calls and emails
circumstantially supporting a conspiratorial agreement.  Id. at 188.

More recently, in <u>Mayor & City Council of Baltimore</u>, the Second Circuit reviewed whether allegations of certain parallel conduct in the auction rate securities market were sufficient to support a § 1 conspiracy. Plaintiffs alleged that defendant banks conspired with each other to simultaneously stop buying auction rate securities for their own proprietary accounts, causing auctions to fail and the market to collapse. 709 F.3d at 131-32. The Court found that the allegations supported only parallel conduct. <u>Id.</u> at 138.

The Court began by noting that the crucial question in a Section 1 case is whether the challenged conduct stems from an agreement, and that the existence of such an agreement is a legal conclusion to be determined by the court—and not a factual allegation. <u>Id.</u> at 135-36 (citing <u>Starr</u>, 592 F.3d at 319 n.2 (2d Cir. 2010)). The Court further stated that plaintiffs must allege additional circumstances supporting an inference of conspiracy; merely alleging that parallel conduct occurred is insufficient to overcome a motion to dismiss because it would "risk propelling defendants into expensive antitrust discovery on the basis of acts that could just as easily turn out to have been rational business behavior as they could a proscribed antitrust conspiracy." <u>Id.</u> at 136-37. The Court found that defendants' alleged actions—an en masse flight from a collapsing market in which they had significant downside exposure—made perfect sense in light of their business interests. <u>Id.</u> at 138. This made the case different from <u>Starr</u>, in which specific allegations supporting an inference that defendants' parallel conduct was against their own economic self-interest led the Second Circuit to conclude that plaintiffs

had plausibly alleged an antitrust conspiracy.  See id. at 138-39 (citing Starr, 592

F.3d at 327.)  Accordingly, the Court affirmed defendants' motion to dismiss.  Id. at

140.

C.    Discussion of Plaintiffs' § 1 Claims

In order to make out their § 1 conspiracy claim, plaintiffs must plausibly

allege facts that support (1) an agreement amongst the warehouse defendants to

restrain load-outs of aluminum (not the price of aluminum), and (2) an agreement

between the trader defendants and the warehouse defendants to effectuate this

scheme.  Plaintiffs have failed to do so.

Certain facts alleged in all of the complaints underpin plaintiffs' § 1

conspiracy claim:  over just a few years, stocks of aluminum in the Detroit area

increased and load-outs in that area decreased substantially, causally increasing

storage costs and the Midwest Premium.  Plaintiffs, whose purchases of aluminum

in some way incorporated the Midwest Premium, thus paid more than they

otherwise would have.  Put simply, according to plaintiffs, the owners of aluminum

stocks conspired to obtain and increase already high levels of inventory, and the

warehouses assisted by delaying load-outs and not increasing load-out rates.

Plaintiffs further allege that the trader defendants enhanced delays with high

levels of warrant cancellations.  The LME's role was to allow all of this to happen,

obtaining greater revenues from storage fees as a result (also, in part, leading to an

inflated value for the LME itself).  Plaintiffs allege that defendants' behavior

constituted an output restraint which led directly to an increase in the Midwest Premium, the classic example of anticompetitive conduct that is illegal per se.

The simplicity of this narrative masks the complexity of the market structures plaintiffs also allege, and that in light of those structures, efficient market behavior supports defendants' actions as logically independent and unilateral. Frankly put, the economics of the alleged conspiracy as pled do not work. The allegations, measured against fundamental economic theory, do not contain sufficient "factual content that allows the court to draw the reasonable inference" that defendants engaged in an anticompetitive conspiracy. Iqbal, 556 U.S. at 678. In light of these economics, the factual allegations suggest only "the mere possibility of misconduct," Iqbal, 556 U.S. at 679, and do not "nudge[] [plaintiffs'] claims across the line from conceivable to plausible," Twombly, 550 U.S. at 570.

In this regard, the Court is not choosing between competing plausible inferences. Rather, the Court's examination of each of the complaints leads to the following: all plaintiffs have set forth sufficient facts to support that the Midwest Premium increased; they have alleged that this occurred as a result of load-out delays; and they have alleged that they have paid more as a result. But the allegations tell a story consistent with market-driven behavior by traders and warehouses rather than unlawful conspiracy. It does not make economic sense— that is, it is not economically plausible without more—for defendants to have

conspired to achieve an end that the law of supply and demand, combined with the passage of time, would have itself achieved in the absence of a conspiracy.

This is particularly so when it is entirely unclear how the rise in the Midwest Premium—a price component added after defendants' involvement has ceased—could or would have benefitted defendants. Defendants do not compete on the price of aluminum, because they do not sell it; rather, they trade warrants or sell storage space, and compete on the rates they charge for aluminum storage, or on load-out efficiency, or on location—none of which have anything to do with the Midwest Premium.

This breaks into the following pieces:

Plaintiffs have plausibly recited the overall mechanics of raising the Midwest Premium: stockpiling aluminum and then using the built-up inventory to delay load-outs, thereby raising the storage costs that are a component of the Midwest Premium. For this to be a plausible outcome of an unlawful conspiracy, defendants must somehow have benefitted—otherwise it does not make sense. That is, defendants must have stood to benefit in some way from collective action.

Plaintiffs allege that defendants bought, stockpiled and held in order to take advantage of an arbitrage opportunity. (FLP Compl. ¶ 355.) That is, plaintiffs acknowledge that there was an economic advantage to buying and holding due to the "contango" that resulted from the economic recession. (Id. ¶¶ 390-92.) But plaintiffs also acknowledge the vast majority of trading activity relating to aluminum stored in LME warehouses takes place among financial entities, rather

than users of aluminum.  (See Mag Compl. ¶ 24(a).)  Thus, plaintiffs have not alleged any facts suggesting that the defendant <u>traders</u> would have had any rational business motive to sell to <u>users</u> of aluminum before or after the expected price rise had occurred.  There are no alleged customer relationships between the traders and the aluminum users.  Accordingly, even if the alleged conspiracy results in harm to aluminum users, it is therefore not in actuality "in restraint of trade."

Based on plaintiffs' own factual allegations, the arbitrage opportunity resulted from market forces:  it made sense for traders to obtain a futures contract at a low price now, with the bet that the price would increase as the country recovered from the recession.  The defendant traders are alleged to have taken one side of a trading position—which means that someone else took the other.  But plaintiffs do not allege that they ever took the other side of such a trade.

In this context, a buy/hold strategy is perfectly consistent with letting market forces—particularly in the context of an anticipated economic recovery—do the work of creating higher prices.  Higher prices, in this context, equating with a higher futures price of aluminum.  In such an economic context, supply and demand are sufficient to accomplish this.  In this regard, too, a profit-driven desire to own more of a good that is cheap now and anticipated to become more expensive later is consistent with lawful competitive behavior.  Thus far, profit-maximizing behavior would suggest precisely that which is alleged to have occurred here: a trading firms' accumulation of ownership positions in aluminum, and holding that aluminum to increase expected profits.

Important to the economics are plaintiffs' allegations that stocks of aluminum and load-out delays were already increasing and the Midwest Premium was already rising before the acquisitions of the warehouses by the trader defendants in 2010. (See FLP Compl. ¶¶ 14(c), 16, 31, 161; Mag Compl. ¶¶ 52, 71). Therefore, if plaintiffs allege the conspiracy existed before 2010, the warehouse defendants would have had to have separately conspired with each other to create load-out delays. But if the warehouse defendants were creating such load-out delays, what reasonable motivation would Goldman, JP Morgan, and Glencore have had to acquire them? To get them to agree to do that which they were already doing? And at significant cost? Acquiring the warehouse defendants would make more sense if they were not prior participants and had to be acquired in order to ensure their participation. Plaintiffs' allegations of a conspiracy between the trader defendants and the warehouse defendants simply do not square with the increases in aluminum stocks, load-out delays, and the Midwest Premium before 2010.

But who conspired with whom is an issue that extends beyond this temporal issue. Based on plaintiffs' allegations, the number of conspiring entities is significant—and given the identity of those entities, the number of employees and potentially active co-conspirators within this group is large and geographically dispersed. Notably, plaintiffs also do not allege that the warehouse defendants, the LME or the trader defendants compete in a particular market. While the law does not require particularized allegations of the "who, what, when and where" of a conspiracy, it does require more than generalized statements that a conspiracy

existed or that the defendants agreed to engage in it. See Starr, 592 F.3d at 321, 325; Port Dock, 507 F.3d at 121.

The conspiracy plaintiffs allege consists of three groups of actors, none of which are alleged to compete with one another: the LME, the trader defendants, and the warehouse defendants. Plaintiffs allege that at least some of the defendants were on one or more LME committees; presumably this is the basis for some amount of the allegedly conspiratorial communication (one of plaintiffs' alleged plus-factors). But it is unclear who was on any such committee when, and how the composition or decision-making changed when the trader defendants acquired the warehouses in 2010. This is particularly significant in light of the pre-existing facts (pre-conspiracy) of increasing aluminum stocks, delays and Midwest Premium. Thus, generalized allegations of participation on LME committees are alone insufficient.

Further, plaintiffs allege that the trader defendants were legally separate from the warehouse defendants. (See, e.g., FLP Compl. ¶¶ 116-23, 131-41).[35] There is no basis for an assumption that the mere fact of affiliation necessarily means that individuals employed by Goldman Sachs would have communicated with individuals employed by Metro to effect a conspiratorial agreement, nor is there any allegation that such communication occurred. That is also true with respect to JP Morgan and Henry Bath,[36] and for Glencore and PMUSA. Similarly, that

---

[35] This legal separateness is supported by the defendants' Rule 7.1 corporate disclosure statements. (See ECF Nos. 55, 120, 123, 124, 261, 262, 324, 507, 519.)

Goldman, JP Morgan and Glencore may have had an ownership interest in the LME does not lead to a plausible inference of communication between them, or between them and the warehouse defendants before or after 2010.

In addition, however, plaintiffs allege that the LME oversees certain aspects of the warehouses. The LME does not itself own any aluminum or warehouses, but instead oversees a global network of warehouses. (Mag Compl. ¶ 24(e).) The LME has agreements with the owners of these warehouses. (FLP Compl. ¶ 285). This is a vertical relationship: the LME has contracted with the warehouses for services. Separately, the warehouses would have had to have conspired with one another, and somehow, the trader defendants would have needed to have conspired with them. It is unclear whether plaintiffs are alleging that by virtue of common ownership, Goldman and Metro can be assumed to have conspired, but if that is so, did the conspiracy between unaffiliated firms occur between the trading arms (that is, did Goldman and its affiliates conspire with JP Morgan and Glencore and their affiliates?) or did the warehouse defendants conspire and bring along the trading arm of the financial-firm defendant with which they were affiliated?

1.    Rule of Reason or Per Se

Plaintiffs claim to have alleged a horizontal conspiracy in restraint of trade, but they do not allege that defendant warehouses, the LME or the trader

---

[36] The statement by Blythe Masters cited by plaintiffs in their briefs (Agfa Compl. ¶ 56; Comm. Compl. ¶ 66; Cons. Compl. ¶ 72; FLP Compl. ¶ 379; Mag Compl. ¶ 55) suggests only that JP Morgan's ownership of Henry Bath gave it access to more information and data on the physical aluminum market. Standing alone, it does not provide evidence of anticompetitive conduct in the warehouse storage market, nor does it provide any evidence of communications between Henry Bath and JP Morgan for the purpose of effectuating a conspiratorial agreement.

defendants are horizontal competitors. In the absence of the latter, the former cannot be correct. Further, while the allegedly anticompetitive conduct affected the price of aluminum, that conduct only affected one of several components of the price of primary aluminum (specifically, the Midwest Premium). Moreover, the defendants are not sellers of primary aluminum. Accordingly, their conduct cannot amount to "price fixing." The alleged restraint of trade is therefore not one with which this Court has experience, and it would be inappropriate to apply the per se rule.

A rule of reason analysis requires an inquiry into market conditions. <u>Leegin</u>, 551 U.S. at 885-86. Plaintiffs must therefore allege a plausible market in which defendants restrained trade. But plaintiffs have failed to allege such facts.

Rather, plaintiffs have alleged numerous potential "relevant markets." However, there are no allegations supporting who the players are in such markets or how defendants' conduct caused unreasonable restraints of trade in those specific markets. How does the defendants' conduct restrain trade—and what trade? How does it decrease competition and in what market? Does it decrease competition in a market for LME-warehoused aluminum or in a market for warrants and futures contracts in LME-warehoused aluminum, both or neither?

2.    <u>Parallel Conduct</u>

Plaintiffs argue that they have alleged a plausible horizontal conspiracy supported by allegations of parallel conduct and plus-factors. This Court disagrees.

Defendants allege that plaintiffs engaged in the following parallel conduct: that the trader defendants cancelled warrants in parallel (leading to increased aluminum inventories at LME warehouses), and the warehouse defendants delayed load-outs in parallel.[37]  But even conscious parallelism is insufficient to support allegations of conspiracy.  Twombly, 550 U.S. at 553-54; In re Publ'n Paper, 690 F.3d at 62.  And while plus-factors such as a common motive to conspire, actions taken against economic self-interest, or a high level of inter-firm communications may provide the additional circumstances necessary to permit a fact-finder to infer a conspiracy, In re Publ'n Paper, 690 F.3d at 62, plaintiffs have failed to allege such plus-factors here.

Plaintiffs allege as a plus-factor that defendants' alleged conduct was against their self-interest.  Economically, this is incorrect.  In fact, it was entirely consistent with their self-interest.  Plaintiffs' allegations regarding the recession, the contango, and the resulting arbitrage opportunity support sensible parallelism—whether conscious or not —by the trader defendants.  The way that defendants acquired, held, and cancelled warrants simply furthered this arbitrage opportunity, on which it was in each's individual economic self-interest to capitalize.

Similarly, to the extent the warehouse defendants could have sped up load-outs and did not, or even delayed them, plaintiffs again allege that this led to higher storage revenues.  But the warehouse plaintiffs were, after all, in the business of collecting rent for storage; and the longer the storage, the higher the rent.  In this

---

[37] Plaintiffs do not allege why the cancellation of warrants would not alone lead to delays in load-outs as the warehouses struggled to keep up.

sense it would be in the warehouse defendants' economic self-interest to turn a minimum load-out rule into a maximum, so long as they were not losing business due to their slow load-out times. Indeed, this point is further supported by plaintiffs' allegations that warehouse inventories began increasing in 2009, before the trader defendants even acquired the warehouse defendants, as these allegations suggest that the warehouse defendants were motivated to act in this manner of their own accord.

Plaintiffs also cite Metro's incentive payments to aluminum producers along with the fact that the warehouses abided by what the plaintiffs themselves acknowledge was a per-city—as opposed to a per warehouse—rule, and a "no net load-in" rule, as further evidence of plus-factors. Yet these actions are, on their face, perfectly consistent with the warehouses acting in their economic self-interest. There is no allegation that any of the rules were imposed during a period or in a manner suggestive of conspiracy. Further, abiding by these rules in a manner which maximized stocks and storage duration was clearly within the warehouse defendants' economic self-interest. There is also no allegation that the incentive payments were not recovered in expected storage fees; indeed, plaintiffs' allegations regarding the duration of storage supports the opposite conclusion.

Finally, there are insufficient allegations to support inter-firm communications. Committee membership and part-ownership of the LME is, standing alone, not enough. It is no more than suggestive of potential opportunity to communicate, and the Second Circuit has held that "[t]he mere opportunity to

conspire does not by itself support the inference that . . . an illegal combination actually occurred." Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 545 (2d Cir. 1993). And there are no particular facts as to who was on a particular LME committee at a particular time that a rule change was announced or at which suspect action by committee members or others within their control occurred. The FLPs allege that certain defendants had representatives on the Warehouse Committee—but that committee is not alleged to have standalone decision-making abilities, or even to be particularly influential. Plaintiffs allege only that it advised the executive committee (see FLP Compl. ¶ 5(b)), and there is no allegation that any defendant was ever a member of the executive committee. Here, plaintiffs' allegations again amount only to a potentially opportunity to communicate, which is nothing more than a bare assertion incapable of supporting a plus-factor on its own.

Finally, plaintiffs allege the existence of various inquiries and investigations into defendants' conduct. In Starr, such investigations were found supportive of conspiracy in the context of specific additional facts and circumstances separately supporting conspiracy. See 592 F.3d at 323-25. But there was no suggestion in Starr that inquiries or investigations alone can plausibly support an alleged § 1 conspiracy, nor has there been in any other binding case law.

Plaintiffs allege that defendants conspired and agreed to effect an anti-competitive output restraint that caused artificially inflated prices. As discussed

above, in the absence of sufficient allegations, these are conclusory statements insufficient to support plaintiffs' claims.

V.    MONOPOLIZATION CLAIMS

Section 2 of the Sherman Act addresses both the actions of a single firm to monopolize or to attempt to monopolize, and conspiracies and combinations to monopolize.  Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 454 (1993).  The conduct of a single firm violates § 2 only when the firm acts to maintain a monopoly or threatens actual monopolization; unilateral conduct does not otherwise violate § 2.  See id. at 454-55.

To state a claim under § 2, a plaintiff must allege plausible facts that defendant possesses market power (sometimes referred to as "monopoly power") in a relevant market, and the willful acquisition or maintenance of such power as "distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966); see also PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002).  A firm possesses market power when it has the ability to raise price by restricting output.  PepsiCo., 315 F.3d at 107.

In the absence of direct measurements of a defendant's ability to control prices or exclude competition, its market power is determined by reference to the "area of effective competition," which is determined with reference to a specific market.  Id. at 108.  For this reason, monopolization claims generally start with defining relevant product and geographic markets.  See, e.g., id. at 105, 108;

AD/SAT v. Associated Press, 181 F.3d 216, 226 (2d Cir. 1999). "'For a monopoly claim to survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the elasticity of demand, and it must be plausible." Chapman v. N.Y. State Div. for Youth, 546 F.3d 230, 237 (2d Cir. 2008) (quotation omitted).

A relevant product market consists of "products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404 (1956); Todd, 275 F.3d at 200. Products are considered reasonably interchangeable if consumers treat them as acceptable substitutes. PepsiCo, 315 F.3d at 105. Cases are subject to dismissal when plaintiff fails to allege a plausible explanation as to why a market should be limited in a particular way. See Todd, 275 F.3d at 200 nn.3-4 (collecting cases).

For instance, two products may to some degree be interchangeable substitutes and should therefore be included within the same market. Such a situation occurs when the products have sufficiently high cross-elasticities of demand. A sufficiently high cross-elasticity of demand exists when consumers would respond to a slight increase in price of one product by switching to another. Todd, 275 F.3d at 201-02; AD/SAT, 181 F.3d at 227. The question reduces to whether a hypothetical cartel would be unable to increase prices due to the ability

and willingness of consumers to switch to other products.  See Todd, 275 F.3d at

202; AD/SAT, 181 F.3d at 228.

The court must also determine the boundaries of a relevant geographic

market, that is, its area of effective competition.  Tampa Elec. Co. v. Nashville Coal

Co., 365 U.S. 320, 327 (1967); United States v. Eastman Kodak Co., 63 F.3d 95, 104

(2d Cir. 1995).  The geographic market encompasses the geographic area in which

purchasers of the product can practicably turn for alternative sources of the

product.  Tampa Elec., 365 U.S. at 327.  A geographic market is determined by "how

far consumers will go to obtain the product or its substitute in response to a given

price increase and how likely it is that a price increase for the product in a

particular location will induce outside suppliers to enter that market and increase

supply-side competition in that location."  Heerwagen v. Clear Channel Commc'ns,

435 F.3d 219, 227 (2d Cir. 2006).

Defining a relevant market is not always required to determine the presence

or absence of monopoly power, as monopoly power may be proven directly by

evidence of the control of prices or the exclusion of competition.  PepsiCo, 315 F.3d

at 107; Todd, 275 F.3d at 206 ("If a plaintiff can show that a defendant's conduct

exerted an actual adverse effect on competition, this is a strong indicator of market

power."); Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 98 (2d Cir. 1998)

(market power "may be proven directly by evidence of the control of prices").

Alternatively, monopoly power may be shown by one firm's large percentage share

of a defined relevant market.  PepsiCo, 315 F.3d at 107; Tops, 142 F.3d at 98.

However, in most cases this type of direct evidence is absent and defining a relevant market acts as a surrogate for market power.  PepsiCo, 315 F.3d 101 at 107.

While "defining" a relevant market may not always be required, that does not eliminate the requirement that plaintiffs reference a particular market. Heerwagen, 435 F.3d at 229 ("[P]laintiff cannot escape proving her claims with reference to a particular market even if she intends to proffer direct evidence of controlling prices or excluding competition.").

    A.    Attempted Monopolization

To state an attempted monopolization claim, a plaintiff must allege plausible facts supporting that the defendant has engaged in predatory or anticompetitive conduct, with a specific intent to monopolize, and a dangerous probability of success.  See Spectrum Sports, 506 U.S. at 456; PepsiCo., 315 F.3d at 105; Tops, 142 F.3d at 99-100.

    B.    Essential Facility

The FLPs have asserted that the LME warehouses in the Detroit area are an "essential facility."  (FLP Compl. ¶ 303.)  The Supreme Court has never recognized such a standalone claim.  See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 410-11 (2004).  But certain lower courts—including the Second Circuit—have posited that a party may violate § 2 by denying another party access to an "essential facility."  See, e.g., Twin Labs., Inc. v. Weider Health & Fitness, 900 F.2d 566, 569-70 (2d Cir. 1990).  To sustain such a claim, plaintiffs must allege plausible allegations that "an alternative to the facility is not feasible."

Id. at 570.  In fact, this is akin to a type of monopoly maintenance claim.  The Supreme Court also suggested in Trinko that an essential facility claim "should be denied where a state or federal agency has effective power to compel sharing and to regulate its scope and terms."  540 U.S. at 411 (quoting P. Areeda & H. Hovenkamp, Antitrust Law 150 ¶ 773e (2003 Supp.)).

The principle behind prohibiting denial of an essential facility to a competitor is to prevent a monopolist in a relevant market from using its power to inhibit competition in another market.  Twin Labs., 900 F.2d at 568.  Most essential facilities are natural monopolies and the like (such as electric power lines, a basketball arena, a football stadium, and a ski mountain.)  Id. at 569 (collecting cases).

C.     Discussion of the § 2 Claims

As set forth above, plaintiffs allege a number of markets.  However, no plaintiff has alleged the necessary facts to support any plausible product or geographic markets.  No complaint cites facts regarding the interchangeability of products.  For instance, if plaintiffs could have switched to a lower-cost polymer instead of aluminum, they might have avoided the increases in the Midwest Premium.  The binding nature of bilateral contracts with third parties referencing the Midwest Premium would be irrelevant to this product market, but might be relevant to a product market defined to include such contracts.  Simply naming possible markets, even when combined with general allegations of an ability to increase prices, is insufficient.

Plaintiffs argue that they need not allege a relevant market since they have alleged direct evidence of monopoly power, namely, defendants' ability to increase price. But in each complaint with a monopoly allegation (that is, all but Mag's and Agfa's), this argument is based on hundreds of paragraphs of allegations that combine the conduct of many separate actors. The law does not recognize a "shared monopoly." See FLM Collision Parts, Inc. v. Ford Motor Co., 543 F.2d 1019 (2d Cir. 1976) (allegations of a "shared monopoly" amount to no more than a "§ 1 claim under another name"); RxUSA Wholesale Inc. v. Alcon Labs., 391 Fed. App'x 59, 61 (2d Cir. 2010) (same). The only entity as to whom there are allegations of monopoly power that are supported in part would be Metro—but while Metro controlled a certain percentage of warehouse space, it is not alleged to have itself controlled the warrants and futures contracts that determined when aluminum went into and took a place in line to get out of its warehouses. Thus, even Metro's arguable power as alleged does not translate into a power to raise the Midwest Premium.

There are no factually supported allegations that Goldman Sachs (the financial entity) has market power in some cognizable market, or that any of the other financial-firm or warehouse entities do.

Even as to Metro, however, the allegations are insufficient. There is no allegation that Metro owns any aluminum, can control when warrants are cancelled, whether they are moved to an LME-approved warehouse or a non-LME warehouse, or where that warehouse is located. Thus, the plaintiffs' allegations do

not support the ability of Metro alone to raise price. Accordingly, there are insufficient allegations of direct market power.

This, then, leads to a requirement that plaintiffs allege the necessary elements of a relevant antitrust market, specifically, reasonable interchangeability amongst specific products and a geographic area of effective competition. Plaintiffs have failed to meet this requirement. As set forth above in the § 1 rule of reason analysis, simply naming a potential market is only the first step in defining the relevant market.

This exercise is made all the more complicated and necessary by plaintiffs' specific allegations. Plaintiffs allege that the U.S. is a net importer of aluminum. (See FLP Compl. ¶ 303; Mag Compl. ¶¶ 33-34). Thus, aluminum regularly comes into the U.S. from overseas. There are insufficient allegations as to where this product enters the U.S. and its distributional reach for the Court to draw any conclusions as to likely geographic boundaries of the relevant market.

It may also be the case that the product market here is somehow defined with reference not to aluminum itself, but in terms of contractual arrangements referencing the Midwest Premium as a price component. If that is the case, the product and geographic boundaries of the relevant market might be determined by reference to the terms of these contracts. But plaintiffs have made no specific allegations to this effect.

In short, plaintiffs' monopolization and attempted monopolization claims as to all defendants fail due to the insufficiency of allegations regarding a relevant market.

Failing to have plausibly alleged a relevant market also requires dismissal of any essential facilities claim. As an initial matter, it is unclear whether plaintiffs intend their use of the term "essential facilities" to constitute a standalone basis for a claim. As alleged, it cannot. The Supreme Court has never recognized such a claim. See Trinko, 540 U.S. at 410-11. In terms of a species of monopolization claim, it similarly requires allegations of a relevant market. In addition, at the most basic level, it also requires allegations supporting why the facility is, in fact, essential. Plaintiffs' claims in this regard are conclusory, and must be rejected.

VI.    STATE LAW CLAIMS

Plaintiffs' state law claims rely upon the same allegations of conspiracy, monopolization and unfair conduct as their antitrust claims. For the same reasons, none survive.

In addition, plaintiffs' large array of statutory claims fail for the additional reason that plaintiffs have failed to state how defendants' conduct violated any particular statute. Instead, the statutes are listed—and the Court and the defendants are then to determine how and why the alleged conduct violated a particular statute. This is insufficient to meet even the basic requirements of Rule 8. Iqbal, 556 U.S. at 678 ("A pleading that offers labels and conclusions or formulaic recitation of the elements of a cause of action will not do.").

Further, every state statute requires a direct or indirect allegation supporting proximate cause.  Cf. Lexmark Int't Inc. v. Static Control Components, Inc., 134 S.Ct. 1377, 1390 (2014) (a court should generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of that statute).  Plaintiffs here have failed to include any specific allegations of proximate cause.

VII.   SEPARATE MOTIONS

In addition to the arguments that plaintiffs lack standing and have failed to state a claim, Henry Bath, Hong Kong Exchanges and Clearing Limited, Glencore, and LME Holdings have separately moved to dismiss for lack of personal jurisdiction.  (ECF Nos. 327, 447, 503, 511.)  In light of the Court's determinations that dismissal is appropriate on the basis of both standing and failure to state a claim, the Court need not and does not reach this additional argument.  If plaintiffs seek to amend, they should take into account the arguments raised regarding personal jurisdiction.  Should any proposed amendment adequately plead standing and a claim, the Court will then reach the personal jurisdiction arguments in light of any amended allegations.   Accordingly, these motions are DENIED as moot.

Rule 8 provides that a defendant is entitled to notice of the claims brought against him; Twombly makes clear that at the pleading stage in this antitrust case, that means that each defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose.  See Twombly, 550 U.S. at 557-58. Mere generalizations as to any particular defendant—or even defendants as a

group—are insufficient. See Twombly, 550 U.S. at 555-56. The fact that two separate legal entities may have a corporate affiliation—perhaps owned by the same holding company—does not alter this pleading requirement. In the absence of allegations that corporate formalities have been ignored, courts appropriately and routinely adhere to legal separateness. See, e.g., De Letelier v. Republic of Chile, 748 F.2d 790, 794-95 (2d Cir. 1984). Here, this means that grouping defendants who are affiliated together into a single name (e.g. "JP Morgan" or "Glencore" to encompass affiliated trading and warehouse operations) for pleading purposes does not resolve this larger issue. Plaintiffs must be able separately to state a claim against each and every defendant joined in this lawsuit.

As to certain defendants here, that has clearly not occurred. Plaintiffs' allegations as to a number of defendants, including without limitation, LME Holdings, Henry Bath, Henry Bath LLC, Hong Kong Exchanges and Clearing Limited, and Glencore are sparse to the point of near non-existence or are grouped together with specific allegations relating to their affiliated but legally separate entities. A number of defendants (specifically, LME Holdings, JP Morgan, Henry Bath, Henry Bath LLC, Hong Kong Exchanges and Clearing Limited, Glencore, Glencore Ltd., PMAG and PMUSA) have moved to dismiss on the basis that as to them, plaintiffs' claims fail for lack of specificity. (ECF Nos. 309-10, 327-29, 331-32, 338-39, 447-48, 503-05 511-13, 520-21.) The Court resolves the instant motions without the necessity of resolving these additional, individual motions. If plaintiffs seek to amend, they should take into account the arguments raised regarding lack

of specificity as to particular entities. Should any proposed amendment adequately plead standing and a claim as to at least one or more defendants, the Court will then reach these arguments (and with the benefit of any amended allegations plaintiffs may then assert).

VIII.   LEAVE TO REPLEAD

Leave to amend should generally be granted freely. Fed. R. Civ. P. 15(a)(2); Foman v. Davis, 371 U.S. 178, 182 (1962). If an amendment would be futile, however, a court may properly deny leave to amend. Foman, 371 U.S. at 182. This may occur when a proposed amendment would not cure any deficiencies and would also fail to state a claim. See Hayden v. Cnty. of Nassau, 180 F.3d 42, 53-54 (2d Cir. 1999) ("[W]here the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner that would survive dismissal, opportunity to replead is rightfully denied."). A court should judge the adequacy of a proposed amended complaint using the same standards as those governing the adequacy of a pleading. Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991).

As set forth above, the Court's legal analysis indicates that the Consumer End Users and Commercial End Users cannot plead sufficient facts in support of antitrust standing. There will always be others who are more directly injured than them, as well as others who will be more efficient enforcers of federal antitrust laws. That these plaintiffs only request injunctive relief does not, for the reasons stated, eliminate this issue. There is no need for this Court to unnecessarily add complexity to the discovery and fact-finding in this case by permitting these

plaintiffs to pursue their claims when there are other, more efficient enforcers who can adequately pursue such relief.  Accordingly, leave to replead for these plaintiffs is denied and this Opinion & Order is final and appealable as to them.

It is unclear, however, whether the FLPs, Mag, and Agfa will be able to both adequately allege antitrust standing as well as address the other, more merits-based issues the Court has raised above.[38]  Accordingly, should these plaintiffs choose to attempt to replead, they must file any amendment, redlined against their complaint that is dismissed here, and any motion and memorandum in support, within 21 days.

IX.     CONCLUSION

For the reasons set forth above, defendants' motions to dismiss are GRANTED, except for LME Ltd.'s motion to dismiss, which is DENIED AS MOOT. Leave to replead is denied as to the Consumer End Users and Commercial End Users.

---

[38] The Court notes that defendants made numerous arguments in support of dismissal. It is unnecessary for the Court to address every one as those which it has addressed are sufficient at the present to resolve the instant motions.  However, it should be noted that if plaintiffs present an amended complaint, the Court is not foreclosing defendants from raising any arguments in support of futility.  The Court will examine any proposed amended complaint and any arguments in response thereto.

The Clerk of Court is directed to close the motions at ECF Nos. 309, 312, 316, 327, 331, 333, 338, 341, 447, 503, 511, and 520.

SO ORDERED.

Dated:      New York, New York
             August 29, 2014

KATHERINE B. FORREST
United States District Judge